Spencer, Ch. J.
The validity of the deed of settlement has been denied, on the ground that it was never delivered to Mr. Cruger, the trustee. There is no positive evidence that a formal delivery took place. The possession of the deed by Mrs. *451 Jaques is not, inconsistent with a delivery to Cruger ; for the possession of the deed by the cestui que trust was, in a legal \iew, the possession of the trustee. The deed of the 12th of September, 1812, executed by John D. Jaques and his wife, professedly in virtue of the deed of settlement, and in execution of the power contained in it, and the will of Mrs. Jaques, which professed,'also, to be made under the power reserved by that deed, the appointment of her husband as one of her executors, and his qualifying and acting as such executor, are decisive proofs, as regards him, that the settlement deed was well executed ; and after such* repeated and solemn acts of recognition, he cannot be heard to say the deed of settlement was not deli vered.
It appears that Mrs. Jaques was the owner of a considerable real and personal estate ; and it does not admit of a doubt, that her object, in making the deed of settlement, was to guard against the legal effects of a marriage, which, by operation of law, would devest her absolutely of her personal estate, and take from her, during the coverture, all control over her real estate. ] ler motives could not be to guard against herself, but to retain dominion over her estate, and to prevent her intended husband from intermeddling #with her estate, any further than she was pleased to allow.
The deed of settlement is upon the trust, that the trustee should permit her to hold, enjoy, and let the premises conveyed, and receive and take the rents and profits, and that her receipts should alone be sufficient discharges ; so that the same should not be subject to the debts, control, or intermeddling of her intended husband, but should be to the only use, benefit and disposal of her, dtiring her natural life, and then to the u-e of those to whom she should grant or devise the same, by iier last will and testament, lawfully executed. The question is, whether Mrs. Jaques, with respect to her estate, is not to be regarded in a court of equity as a feme sole, and may not dispose of it as she pleases, without regard to her trustee; there being nothing in the deed of settlement requiring the consent or concurrence of her trustee, nor any negation of an unlimited power of disposition of the estate by her.
I have examined this case with the unfeigned respect which T always feel for the learned chancellor, who has denied the right of Mrs. Jaques to dispose of her estate, without the consent or concurrence of her trustee ; and I am compelled to dissent from his opinion and conclusions. From the year 1740, until 1793, (with the single exception of the opinion of Lord Bathurst in Hulme v. Tenant, which occurred in 1778, and in which case a rehearing was granted by Lord Thurlow, and the opinion reversed,) there is an unbroken current of decisions, that a feme covert, with respect to her separate estate, is to be regarded in a court of equity as a feme sole, and may dispose of her property without the consent or concurrence of *452 her trustee, unless she is specially restrained by the instrument under which she acquires her separate estate. There are nearly twenty cases decided by Lord Hardwick e and Lord Thurlow, containing the principle I have stated, and which I shall not weary the patience of the court by citing. The case of Sockett v. Wray Br. Ch. C. 483.) before Sir 11. P. Arden, (Master of the Rolls,) in 1793, was the first case to break the continuity of decisions. This formed a precedent for the case of Hyde v. Price; (3 Vesey, jun. 437.) then #followed the cases of Whistler v. Newman, (4 Vesey, jun. 129.) and Mores v. Huish, (5 Vesey, jun. 692) decided by Lord Loughborough. In Whistler v. Newman, Lord Loughborough admitted, that the cases had gone the length, and that he was bound by them, that if a married woman has separate property, she may dispose of it, and the trustees were bound to follow her disposition. In Mores v. Huish, his lordship distinguished it from the preceding cases. These cases are succeeded by many others, after Lord Eldon became chancellor, in which he restored the law to its first and ancient principle. In the case of Parkes v. White, (11 Vesey, jun. 209.) he reviewed all the cases, and strongly intimated, that the decision in Whistler v. Newman was in opposition to all the authorities for a century. He laid down the rule to be, that a married woman, having an estate to her separate use, is capable of disposing of it, provided the transaction is free from fraud, and no unfair advantage is taken of her.
The mistake into which I think the chancellor has fallen, consists in considering Mrs. Jaques restrained from disposing of her estate in any other way than that mentioned in the deed of settlement. The cases, in my apprehension, are clearly opposed to this distinction; and I am entirely satisfied, that the established rule in equity is, that when a feme covert, having separate property, enters into an agreement, and sufficiently indicates her intention to affect by it her separate estate, when there is no fraud or unfair advantage taken of her, a court of equity will apply it to the satisfaction of such an engagement. This was the principle adopted by Lord Hardwicke, in Grizby v. Cox, (1 Vesey, senr. 517.) and the same doctrine prevailed in Pybus v. Smith, Ellis v. Atkinson, and in Newman v. Cartony, (3 Br. Ch. C. 340. 346.) In Pybus v. Smith, Lord Thurlow observed, if a feme covert sees what she is about, the court allowed of the alienation of her separate property. The same principle was adopted in Fettigplace v. Gorges, (3 Br. Ch. C. 8. 1 Vesey, jun. 46.) and in Wagstaff v. Smith, (9 Vesey, jun. 520.) It seems to me, that the power reserved to Mrs. Jaques, by the deed, has been misconceived ; I understand it, that during her life, her estate is to be at *her absolute disposal, with a further power to grant and devise it by her last will and testament; but if the power of disposition was specifically pointed out, it wmuld not preclude the adoption of any other mode of disposition, unless there were *453 negative words restraining the exercise of the power, but in the very mode pointed out. .
Chancellor Dessaussure, in 3 Equity Reports of cases determined in South Carolina, p. 427., has, with great ability, ex-arnined all the cases upon this subject, and arrived at the con-elusion I have formed. It is true, that his opinion, and that of Chancellor Thompson, who concurred with him, were overruled by the three other chancellors ; but it was upon the express ground, that the question was res nova in that state, arid that they were not bound by decisions in England in consequence of a colonial statute of 1721. And those who differed in opinion from chancellor Dessaussure, admit that his opinion was in conformity with the English decisions.
This is the first case in which the power of a married woman having separate property, to dispose of it at her will and pleasure, when not expressly restrained in the mode of exercising that will, has arisen in our courts. I confess that my partialities in favor of marriage settlements are not so strong, as to induce any desire to see the law altered. Generally speaking, the rules of the common law, which give to the husband all the wife’s personal property, and the rents and profits of her real estate during coverture, are better calculated, in my judgment, to secure domestic tranquillity and happiness, than settlements securing to the wife a property separate from and independent of the control of the husband. An improvident and dissipated husband may squander his wife’s property, and reduce both of them to penury and distress. On the other hand, the possession by the wife of property, independent of and beyond the control of the husband, would be likely to produce perpetual feuds and contention. Marriage is a union of persons and interests, pro bono et malo, and the ancient provisions of the common law show forth, in our own country, decisive proofs of its benign and salutary influence. I have, all along, intended to be understood, that the disposition by the wife must %e free, neither the result of flattery, nor of force, or harsh and cruel treatment; and in the present ease there is no evidence, that Jaques treated his wife with unkindness, or employed any censurable means to induce her to bestow her bounty on him ; on the contrary, the evidence is that he uniformly treated her with kindness and affection.
It necessarily results from the power which I suppose Mrs. Jaques to have had over her property, that she might give it away, without any formal act, in the same manner as though she had been sole; and her agreement that the family expenses were to be borne out of her estate, especially when executed by her, was a valid act. She was well situated as regards property,' while her husband was in quite moderate circumstances. She chose, after the marriage, to maintain her former equipage, and the husband acquiesced in her .wishes. It would be extremely hard and unjust, to throw upon him the charge of her *454 establishment, when it is clear that she meant to defray the expense of it herself. My opinion, accordingly, is, that the agreement is valid, and that the husband is not only not to be charged with any sums of money expended for the maintenance of the family, but that he is to be allowed for all advances for object; and also for moneys advanced for necessary reparations to her estate.
The chief justice then examined the other points in the case ; but as no legal principle was involved in the discussion of them, it is unnecessary to state the remainder of his observations.
Platt, J.
The facts in this cause are so multifarious and complicated, and the field opened for legal research is so extensive, that I approach the investigation with great embarrassment and diffidence.
As to the first question, I concur in the opinion of his honor the chancellor, that the deed of marriage-settlement must be deemed valid and binding ; and having come to that conclusion, for the reasons assigned by him, it is unnecessary here to repeat them.
#The important question presented in this cause is, as to the construction and effect of the marriage-settlement. On this point, after much labor and reflection, I am compelled, notwithstanding my unfeigned and habitual deference for his great learning and distinguished talents, to dissent from the opinion of his honor the chancellor. He admits the rule, “ that a married woman is considered in equity, with respect to her separate property, as a feme sole; and is held to have an absolute dominion or power of disposition over it, unless her power of disposition be restrained by the deed or will under which she became entitled to it.” And as to the rule of construction, he also admits, that “ the weight of book-authority, and especially of the writers who have treated on this branch of the law, is against his conclusion and that “ they seem to hold, that there must be an express restriction upon alienation, either absolutely, or in some other mode than the one mentioned, or the wife will not be bound.” The chancellor says, “ Such strong aversion to the wife’s independent enjoyment of her separate estate, manifested so early in the history of the cases, may have given a permanent tone and color to the doctrine of the court.” With great respect, I ask, in reply, May it not rather be said, that the “ tone and color” of the modern decisions are accommodated to the excessive refinements of society, and the artificial innovations, in regard to the rights and duties of good old English matrimony ? In the language of Sir Wm. Blackstone, “ By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the mar *455 riage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection and cover she performs every thing.” I confess, that I love and venerate the primeval notion of that mystical and hallowed union of husband and wife: when “they twain became one flesh;” when they “ forsook father and mother, and clave to each other” with unreserved confidence. Marriage, in that old fashioned sense, is the purest source of domestic joys, and the firm foundation of social order.
#I bow to the rule, as I find it established : but I lament the complicated and artificial anomalies in the relations of domestic life, which have grown, and are still growing, out of the practice of marriage-settlements. They give to the wife the amphibious character of a feme covert and tí feme sole. I view it as an adulteration of that holy union : as a divorce, pro tanto, Of the marriage contract. A wife, in the “ independent enjoyment of her separate estate,” armed with distrust of her husband, and shutting out his affections and confidence, by refusing to give her own in mutual exchange, is an object of compassion and disgust. Legal chastity cannot be denied to her.: but there is danger, that the sacred institution of marriage may degenerate into mere form. It is sometimes, in practice, little more than legalized prostitution ; and the parties seem to have no higher objects than sexual intercourse, and the sanction of legitimacy for their offspring. If, in the rapid progress of refinement in civilization, it shall be thought expedient to go one step further, and to allow the wife, by ante-nuptial contract, to stipulate for an exemption from personal control over her by the husband, then the quasi divorce would be extended one degree further, so as to confer on her the independent enjoyment of the rights and privileges of a kept mistress. But she would have little claim, indeed, to the endearing appellation and character of a wife.
The new rule, introduced by Sir R. P. Arden and Lord Loughborough, and which has beén adopted by his honor the chancellor in this case, will, I think, tend to sever, in some degree, the marriage union ; because it not only renders the wife independent of her husband, as to her fortune, but bars him from a participation of it, by new and increased impediments; as if he were presumed to be her worst enemy. Now, if matrimony is not safe and desirable, without these trammels, and fences, and reservations, and restrictions, I say, marry not at all! The ancient rule was adapted to the state of English manners in the days of Lord Macclesfield, and accords best with the general simplicity of society among us at this day. I know that particular cases often occur, when such restraints would be salutary ; *but, as a general rule, their operation would be unfavorable to connubial happiness. The same benign policy, which forbids divorces a vinculo, also forbids the extension of a rule, which impairs the union, and lessens the *456 attributes of holy matrimony. It is better that confidence between husband and wife should sometimes be abused, than that it should not exist in that relation. We often see acts of tyranny and cruelty exercised by the husband towards the person of the wife, of which the law takes no cognizance ; and yet 110 inan wisdom and reflection can doubt the propriety of the rule, which gives to the husband the control and custo dy of the wife. It is the price which female wants and weak ness must pay for their supply and protection. That a woman should contemplate her intended husband as likely to become her enemy and despoiler, and should guard herself against him as a swindler and a robber, and then admit him to her embraces, presents a sombre and disgusting picture of matrimony. Marriage justly implies a union of hearts and of interests ; and the modification of that relation, which excessive refinements have introduced, is a fungous excrescence which this court cannot lop off; but we can and ought to prevent its growth.
Of the same character was the new doctrine of Lord Mansfield, and his associates, in the case of Corbett v. Poelnitz, (1 T. R. 5.) in which it was decided, that if husband and wife choose to separate, and the husband allows the wife a separate maintenance, she may contract and be sued, as though she were unmarried, and may be held to bail and imprisoned on a ca. sa. without her husband. That innovation was made on the ground that “ as the times alter, new customs and new manners arise, which require new exceptions, and a different application of the general rule. But it was soon discovered that, instead of waiting to follow, the Court of K. B., on that occasion, outran the customs and manners of altered times; and in Marshall v. Rutton, (8 T. R. 545.) and Wardell v. Gooch, (7 Past. 582.) Lord Kenyon and Lord Ellenborough restored the ancient rule.
I would not be understood as censuring, indiscriminately, the precaution of placing the property of the wife in the hands of trustees, to shield it from the previous creditors of *the husband. It is undoubtedly often just and commendable for parents to make family settlements, so that daughters may be protected from the effects of prodigality, want, and oppression. But all this may be consistent with the idea of a community of interest between husband and wife; so far, at least, that she may permit him to participate in the enjoyment of whatever is her own. It must, however, be admitted that, by our law, a woman may, by marriage settlement, so transfer her estate, as to devest herself irrevocably of all right of future control or disposition of it. So, also, she may limit and restrict herself, as to the precise mode of disposing of her separate property. But this is against common marital rights; it is generally unfavorable to conjugal happiness, and is inconsistent with public policy. I, therefore, incline to the rule of equity as administered by Lord Macclesfield, Lord Talbot, Lord Hardwicke, *457 Lord Thurlow, and Sir Hit Ham Grant; and as it was very ably, though unsuccessfully, vindicated by the learned and venerable Chancellor D.essausmre, in the case of Ewing v. Smith {3 Equ. ji<p. S. Carolina, 447.) which rule I understand to be substantially this : that a Jeme covert, having a separate estate, is to be regarded as a feme sole, as to her right of contracting for and disposing of it. The jits disponendi is incident to her separate property, and follows, of course, by implication. She may give it to whom she pleases, or charge it with the debts of her husband, provided no undue influence be exerted over her ; and her disposition of it will be sanctioned and enforced by a court of equity, without the assent of her trustee, unless that assent be expressly made necessary by the instrument creating the trust. And the specification of any particular mode of exercising her disposing power, does not deprive her of any other mode of using that right, not expressly, or by necessary construction, negatived, in the devise or deed of settlement. (Powell v. Hankey, 2 Peere Wms. 82. Squire v. Dean, 4 Bro. 326. Smith v. Camelford, 2 Ves. jun. 698. Brodie v. Barry, 2 Vesey and Beame, 36. Dalbiac v. Dalbiac, 16 Vesey, 126. Peacock v. Monk, 2 Vssey, 190. Norton v. Turvill, 2 P. Wms. 114. Ridout v. Lewis, 1 Atk. 269. Stanford v. Marshall, 2 Atk. 69. Allen v. Papworth, *1 Ves, 163. Penns v. Peacock, Cas. temp. Talb. 41. Grigby v. Cox, 1 Ves. 517. Pawlet v. Delaval, 2 Ves. 663. Newman v. Cartony, 3 Bro. 347. Hulme v. Tenant, 1 Bro. 16. Pybus v. Smith, 3 Bro. 340. Heatly v. Thomas, 15 Ves. 596. Fettiplace v. Gorges, 3 Bro. 8.)
The ante-nuptial agreement qualifies the marriage contract, so that the wife retains all the rights which she could have exercised over the property as a feme sole; except so far as she has, in express terms, incapacitated herself by that instrument. The trustee is the mere depositary of her title and estate, in order that her husband may not come to the possession or enjoyment of it without her consent; and that it may not be liable to the claims of his creditors, unless she chooses so to apply it.
t admit that she may give larger powers to her trustee, so as to lock up the estate, or restrain her own disposing power over it, if the deed necessarily imports such intention. But, as was said by Lord Macclesfield, in Powell v. Hankey, (2 P. Wms. 82.) “it is against common right, that the wife should have a separate property, (the husband and wife being in law but one person,) so all reasonable intendments and presumptions are to be admitted against the wife.” In that case, the marriage settlement bore a strong resemblance to the one now before us; and after the marriage, the wife permitted her husband to receive the interest of all her securities, without any complaint to the debtors who paid the moneys, or to . her trustee; and the lord chancellor, therefore, “intended that tins husband received the interest by her consent, as a gift from *458 her; and that the husband, acting on that presumption, might have lived in a more plentiful manner: the comfort whereof the wife must, have shared in.” An account against the husband’s executors for those moneys was, therefore, refused.
In Peacock v. Monk, (2 Vesey, 290.) Lord Hardwicke said, “ Where there is an agreement between husband and wife before marriage, that the wife shall have personal property to her separate use, she may dispose of it by an act in her life, or will: she may do it by either, though nothing is said of the manner of disposing of it.” So, in the case of Grighy v. Cox, (1 Vesey, 517.) Lord Hardwicke stated #the rule to be, “ that where any thing is settled to the wife’s separate use, she is considered as a feme sole, and may appoint in what manner she pleases ; and that her trustees need not join, unless made necessary by the instrumentand that “ the wife might make an appointment in favor of her husband, if fairly procured, without improper influence.”
In Hulme v. Tenant, (1 Bro. 16.) and in Pybus v. Smith, (3 Bro. 340.) Lord Thurlow followed the same old rule, yielding, though with reluctance, to the uniform current of authorities. In Heathy v. Thomas, (15 Vesey, 595.) Sir Wm. Grant adhered to the ancient rule. But in Sockett v. Wray, (4 Bro. 383.) and in Hyde v. Price, (3 Vesey, 437.) Sir R. P. Arden resisted the hitherto unbroken current of decisions; and in Milnes v. Bush, (2 Vesey, jun. 488.) Whistler v. Newman, (4 Vesey, 129.) and Mores v. Huish, 5 Vesey, 692.) Lord Loughborough followed in this new tract. In Sperling v. Rochfort, (8 Vesey, 164.) Rich v. Cockell, (9 Vesey, 369.) and Jones v. Harris, (9 Vesey, 497.) Lord Eldon vibrates, and falters, and doubts, till, in the last case, he comes to the hesitating avowal, that it was “ an open question, and one doubtful, and deserving of a very full review, whether the separate property of a feme covert might be charged in a different form from that prescribed by the instrument.” In the subsequent case of Parkes v. White, (11 Vesey, 209.) Lord Eldon said his mind was in great distraction on this subject; but he admitted that Lord Thurlow, “ in his decisions on this principle, had followed his predecessors, as far back as the doctrine can be traced and he concluded, by saying, “ If it be asserted that this court has now a right to refuse to follow it, I am not bold enough to act upon that position.”
The ante-nuptial agreement, or deed of settlement in this case, recites that the intended husband “ has agreed not to in-termeddle with, or have any right, title or interest, either in law or equity, to any part of the rents, issues, profits or proceeds of her property, real and personal; but it is to continue, remain, and be to her, or to such uses as are in this deed of settlement expressed.” The deed then conveys all her estate, real and personal, to Henry Cruger, “in trust for her; and upon her marriage, to the use of such #persons and uses, and *459 subject to such provisions as she, with the concurrence of her husband, should by deed, or by will, without his consent, give, limit, direct and appoint. In default of such directions, &c. then in trust, to permit her to hold and enjoy the same, and receive and take the rents, issues and profits; and that her receipts shall alone be sufficient discharges from time to time; to the end, that the same shall not be subject to the control, debts, intermeddlings or engagements of her husband, but shall be to her only use, benefit and disposal.” Considering it as a question of construction and intention merely independent of the adjudged cases, I am of opinion, that the fair and natural import of the deed is, that she intended so to modify the marriage contract, as to retain the entire right of property in all her estate, real and personal, through the intervention of her trustee; and that she should, also, retain the sole, entire, and exclusive right of using and disposing of it, as if she were to remain a feme sole.
We must set out in the argument, with the consideration, that she alone was absolute owner of all the property, and had a perfect right to dispose of it as she pleased. And the question then is, How far, if at all, did she devest herself of the estate, or of her disposing power over it, by the deed of settlement ? In my judgment, it would require plain and expres' words to authorize the conclusion, that she meant to lock uj her property, or to tie her own hands in the use of it, or t > restrict herself in the mode of disposing of it. The specification that she might dispose of it by deed, or by will, affords no necessary implication, that she might not do it in any other mode common to every proprietor. The specification, ‘ by deed,” was probably made with a view to her real estate only, and may be deemed to have been inserted at the instance of the husband; because it contains, perhaps, an implied stipulation, that she should not execute a deed without “ his concurrence.” And the specification, “by will,” was inserted to remove all doubt as to her right to dispose of her property in that mode, “ without her husband’s consent.” If the terms of the instrument imposed any restriction on her disposing power it was in favor of her husband, merely, to wit, that she should do it by deed, with *the concurrence of her husband; but if it be considered as a stipulation in his favor only, then it follows, that he may waive it, at his pleasure ; which he has done.
That she meant no more than to deprive her husband of his marital rights, in regard to her property, I think is evident from the very appropriate words in which she has expressly declared her intention ; to wit, “ to the end, that the same (her property) should not be subject to the control, debts, inter-meddlings, or engagements of her husband; but should he to her only use, benefit, and disposal.” She xvas a widow, without children, and at a time of life which forbade the prospect of her having any ; living in a fashionable style, with a handsome *460 fortune, and knowing that her intended husband had little or no property ; and it would, indeed, have been very extraordinary, if she had designed to limit herself in the use and enjoyment, or in the mode of disposing of her own property ; and, least of all, ought we to presume, that she meant to restrict herself, as to the measure or the manner of her bounty, towards the man who was to become the partner of her joys and her sorrows. In plain truth, she meant that he should be put upon his good behavior ; and that her liberality and confidence should be regulated by his merits as a husband.
My conclusion, therefore, is, that the/w.s disponendi, retained by Mrs. Jaques over her separate estate, by virtue of the deed of settlement, was absolute and entire ; and that she had a right, and was competent, not only to dispose of that property for her own use and pleasure, but to supply the wants of her husband from that fund, and to give him such parts of it as she chose, in the same manner as she might have done, if he had not been her husband. With this difference only, that, as between husband and wife, courts will scrutinize the transaction with a jealous eye, in order to protect the wife against undue influence. And here, with great deference to his honor the chancellor, and to Sir R. P. Arden, Lord Loughborough, and Lord Eldon, I cannot forbear to remark, that they appear to lay more stress on the node of appointment by the wife, than a due regard to her security demands. It is difficult for me to perceive why the undue influence of the husband may not be as easily %nd as successfully exerted, by inducing the wife to sign a deed, as in procuring parol gifts or appropriations by her. For it must be remembered, that such a deed of appointment by a feme covert of her separate estate, requires no judicial examination as to her freedom of will.
From the evidence as to the life and conduct of the appellant, John I). Jaques, in the character of a husband, I think it due to him to say, that he sustained that character in a creditable manner. His conduct towards his wife appears to have been kind and faithful; and, in the charge and management of her property, so far as it naturally devolved upon him as her agent, he conducted her affairs with prudence and discretion. His neighbors and domestics have been called to disclose his most unguarded words and actions, in relation to his wife and her property ; and few men, indeed, could bear such an inquisition as he has been subjected to, with less disparagement. From the charge of prodigality, he stands perfectly acquitted ; the allegation of embezzlement is not proved, and I see not the slightest evidence of coercion, restraint, or undue influence by him over the disposing power of his wife. The case shows, that she lived after the marriage as she had been accustomed to do before, in a style corresponding to her fortune ; that little more than the income of her estate was exhausted, by all her expenses and liberality. She died without issue, and devised *461 one third of her estate to her husband, one third to distant relatives, and one third to her church. This final distribution of her bounty, while it evinces her gratitude and affection for her husband, also shows the independent exercise of her disposing power. The important fact, that she retained the set-dement deed in her own possession, without ever complaining to her trustee, or claiming any protection from him under it, although he constantly resided in her neighborhood, is strong evidence of the propriety of her husband’s conduct, and of her assent to his acts in relation to her property. She seems to have treated the deed of settlement as a weapon or a shield, which she kept in reserve, but which, happily, she never found occasion to use.
⅝1 am, accordingly, of opinion, that there is no just distinction between the income of her estate, or the interest on her securities, and the estate or principal from which that income and interest arose, in regard to her power of disposal. Being mistress of her own fortune, she had as perfect a right to give it to her husband, or to the church, by a voluntary act in her lifetime, as to do it by her will. As to the mode, she was subject to the general law for transferring property.
In regard to that part of the decree which relates to the lots of ground bound by the mortgage and judgment which the wife held against Christian M. Heyl, the answer of the appellant avers, that those securities were placed in his hands by his wife, with full knowledge of the prior encumbrances which had been purchased up by him; that she desired him to do the best he could, and to apply the proceeds, both principal and interest, towards family expenses, and the repairs of her estate; that, accordingly, upon the foreclosure and sale, he purchased in the mortgaged premises, and took a deed to himself, discounting the price from the sum due on the securities; and that he advanced his own money to an equal amount, in lieu thereof, toward the support of the family, pursuant to his wife’s directions.
Robert Jaques, a witness for the appellant, John D. Jaques, confirms that allegation ; and he further testifies, that during the last illness of Mrs. Jaques, he was requested by her to draw a deed of trust, disposing of her real estate, “on which occasion she told him, that the Heyl property, meaning the lots covered by the mortgage and judgment aforesaid, and which had been bought in by John D. Jaques under the foreclosure, and under the arrangement made on that occasion, belonged to her husband, into whose hands she had put all her claims against said Heyl; and that the proceeds thereof had been expended by him in support of her family, and in expenses relating to her property; and that she had nothing to do with the aforesaid property of said Heyl” Margaret Stuart’s testimony confirms that of Robert Jaques, as to all those facts; and these admissions of Mrs. Jaques, of the title *462 of her husband to those lots, and *that he had accounted to ^er satisfaction for the price of them, is evidence that she had authorized and ratified his acts, and rebuts the equity now claimed as to those lots.
I think the evidence is insufficient to show, that the renewal hhe lease for the lot in Murray street, in the name of John I). Jaques, was procured by the money of his wife. The fact is denied, and the proof rests on vague surmise. But if it were so, then the acknowledgments of Mrs. Jaques are evidence, that he had accounted to her satisfaction. The subsequent sale of that leasehold estate by John D. to Robert Jaques, therefore, stands unimpeached, and subject to no trust.
There is no doubt of the rule, that a trustee, without the previous consent of his cestui que trust, cannot speculate for his own benefit, by purchasing with the trust funds. Such purchases enure to the benefit of the cestui que trust. But this means no more than that the cestui que trust may, at his election, either affirm such speculating purchase, and charge his trustee with the money so expended, or he may insist on holding the land for his own benefit, and credit his trustee for the price paid.
A view of the whole evidence in this case, I think, warrants the conclusion, either that Mrs. Jaques, when she placed those securities in the hands of her husband for collection, agreed that he might purchase in the mortgaged lots for his own bene fit, accounting to her in family expenses for the price ; or that subsequent to the purchase by the husband, as her agent, and with a full knowledge of the transaction, she elected to affirm the sale to her husband, for his own benefit, and thereby waived her claim to the lots as cestui que trust. Upon either supposition, the equity now claimed in regard to those lots is rebutted.
If a married woman be permitted under a settlement to act as a feme sole, in regard to her property, it is perfectly reasonable that her acts, declarations and confessions, freely made, should be allowed to have the same effect in regard to the rights and interests of others, as if she were in reality a feme sole. Here it is proved by two witnesses, that Mrs. Jaques delivered the bond and mortgage, &c. to her husband, *and told him to do the best he could with them, and to apply the avails towards the support of the family, and in repairs and improvements of her estate; and that she afterwards pointedly acknowledged that he had foreclosed the mortgage, and had purchased in the lots for himself; and that he had accounted to her for the avails of those securities in a satisfactory manner ; that the lots belonged to her husband, and she had no claim to them. Now, suppose they had not been husband and wife, and the same facts had occurred between them, could there be a doubt that she, and all persons claiming under her, would be barred of any claim to those lots ?
*463 Several witnesses swear, that she repeatedly declared that her household establishment, and all her family expenses, were supported and paid out of her estate, according to the mutual understanding between herself and her husband previous to their marriage. And this arrangement, so probable and so reasonable, accords with all her subsequent life and conduct. It is true, that such an agreement was revocable at her pleasure ; and if she had insisted upon her strict legal rights, her husband was bound to maintain her, at his own expense, but certainly not in such a style as she chose, and had been accustomed to.
His honor the chancellor says, “ The defendant ought to be precluded by his deed of settlement, from claiming any part of his wife’s estate, founded on any parol agreement or gift of the wife, and he sets up no otherand “ to allow the husband to set up contemporary, or subsequent parol agreements, confessions, or gifts, would be allowing him to contradict and defeat the settlement.” This was a proper inference and deduction from the rule of equity and principle of construction adopted by the chancellor ; to wit, that “ her disposition of the property was to be by deed, in concurrence with her husband, or by will without it; and that her receipts were to be alone sufficient discharges, from time to time, of her title to the rents, issues, and profits.” But constrained, as I am, to differ in judgment from his honor the chancellor, in that cardinal principle and *rule of construction, the natural consequences of his position on that point do not stand in my way. [f, as I contend, the wife had an unlimited disposing power over her separate estate, with the single qualification that, perhaps, she could not convey her interest in her lands without the concurrence of her husband, then it follows, that there is no repugnance between her “ parol agreements, confessions, or gifts,” and the deed of settlement; nor do they “ contradict or defeat ” that settlement. The appellants claim under her as a feme sole; and all the admissions, parol agreements, and gifts, which she was competent to make, are obligatory upon them. She had power to consent, by parol, that her husband should not only receive her income, but also collect her debts; and when the moneys were in his hands, she had an equal right to direct, by parol, the application of them to the support of the family ; to the payment of debts due from her ; or she might, in the same manner, give the money to him or to whom she pleased; and after such application was actually made, those acts were irrevocably binding on her, and all claiming under her. She had as perfect a right to give money to her husband, as to give it “ for building a church at Rahway.” Such gifts were perfected by delivery only ; and her admission that she made such gifts or appropriations, is as valid in the one case as in the other.
My opinion, therefore, is, that the decree ought to be reversed.
*464 This being the opinion of a majority of the court, (Austin, Notes, and Swart, Senators, dissenting,) it was thereupon “ ordered, adjcdged and decreed that the decretal order made by his honor the chancellor, in this cause, on the 27th day of June, 1815, be reversed, so far as the same declares and £iecrees that the freehold estate, situate adjoining to Warren street in the city of New- York, mentioned in the pleadings in this cause, the title to which stands in the name of the said John D. Jaques, which title he acquired from a master in chancery, in consequence of a sale thereof under a decretal order of the said Court of *Chancery, founded on a mortgage thereof, given by one Christian M. Ilcyl, in the pleadings for that purpose mentioned ; and, also, the leasehold estate situate adjoining Murray street, in the city of New- York, the title to which stands in the name of the said Robert Jaques, and which title was acquired from the said John D. Jaques, by assignment, as in the pleadings mentioned, respectively, of right belonged to Mary, late wife of the said John D. Jaques. at her death; and that the said last-mentioned estates of right belong and are distributable, according to a certain deed in the pleadings mentioned, to the said Robert Jaques, on the 22d of September 1812, and the last will and testament of the said Mary; and that, for the purpose of such distribution of the aforesaid estates respectively among the respondents and the appellant, John D. Jaques, according to their respective rights, under the said deed, to the said Robert Jaques, of the 12th of September, 1812, and the said last will and testament of the said Mary, late the wife of the said John D. Jaques, the moneys arising from the sale thereof, under and by virtue of the said decretal order, and deposited with the assistant register of the said Court of Chancery, should remain with him, to abide the further order of the said Court of Chancery relating thereto: And this court doth declare and adjudge that the said moneys of right belong to the said John D. Jaques, and do decree and order that the same be forthwith paid to him as his own proper moneys: And it is further decreed, declared and adjudged that the said John D. Jaques is not, and ought not to be, accountable to the executors of the said Mary Jaques, for any part of the debts which were due, by the said Christian M. Heyl, to the said Mary, as in the pleadings mentioned: And it is further ordered, adjudged and decreed that the said decretal order be reversed, so far as the same orders and decrees the said John D. Jaques to account with the respondents for the rents and profits of the said real estate, adjoining Warren street, from the 1st of March, 1810, the time when he took a title for the same from a master in chancery, as mentioned in the pleadings in this cause ; And so far as the same orders and decrees the said *John I). Jaques and Robert Jaques to account, respectively, for the rents and profits of the said leasehold estate situate adjoining Murray street, standing in the name of *465 the defendant Robert Jaques, from the day last-mentioned, ae-cording to the time they shall respectively have been in possession or in the receipt of the rents thereof; and also so far as the said decretal order orders and decrees that in relation to the said freehold and leasehold estates adjoining Warren street and Murray street, the said John D. Jaques and Robert Jaques should be allowed, respectively, for all allowances by them made thereon, which are of a nature to be permanently useful, or increase the value thereof; and also so far as the said de-cretal-order decrees and orders that the said John D. Jaques shall not have any allowance for expenditures in the maintenance of the said Mary, her family or equipage, during the time she was the wife of the said John D. Jaques; and also so far as the same directs, that in taking the account therein directed of the personal estate of the said Mary, the said John D. Jaques shall not be charged with sums received as interest or dividends arising from the said Mary’s personal estate, during her life, unless where the said John D. Jaques shall show himself entitled thereto, as hereinafter directed and decreed. But that in taking the said account hereafter to be taken, the said John D. Jaques be charged with all the personal estate, as well principal sums as interest moneys and dividends received by him from her personal estate.
And it is further ordered, adjudged and decreed that the decretal order made in this cause, by the said Court of Chancery, on the 5th day of October, 1815, be reversed, in all its parts and directions, except so far as the same Orders, adjudges and decrees that the said leasehold premises adjoining Murray street, in the city of New-York, should not be sold as in the first-mentioned decretal order directed, which said so excepted direction is hereby affirmed. And it is further ordered, adjudged and decreed that the said first-mentioned decretal order of the 27th day of June, in the year 1815, be varied and modified, so far as that the said John D. Jaques may be obliged to account for #the rents and profits of the real estate situate at the corner of Broadway and Reed street, only according to the value of the same to him, as a personal residence, under the circumstances, that he, and the said Robert Jaques, were restrained by an injunction in this cause from letting the same ; and that the same must have remained unoccupied, if he had not occupied the same ; And that, in taking the account of the personal estate of the said Mary, the said John D. Jaques shall not be charged with the moneys received by him for the leasehold estate, in Warren street, sold under the mortgage of the said Christian M. JJeyl, and purchased by or for William Wilmer-ding, in the pleadings in this cause mentioned; and the said John D. Jaques shall be allowed for all moneys over and above the said debts, which were due from the said Christian M. Heyl, to the said Mary, and expended by them at the desire of the said Mary, or for necessary reparations to any part of her *466 estate, or for the support and maintenance of the said Mary, her family establishment, or equipage, during the time she was the wife of the said John D. Jaques ; and also, for all moneys ■which, from the facts or circumstances connected with the same, it shall appear, and be considered, by the said Court of Chancery, that the said Mary intended as a donation from her to him, the said John D. Jaques. And, it is further okdered, adjudged and decreed that the said decretal order of the 27th day of June, 1815, be affirmed, as to all matters not herein and hereby reversed or varied : And it is further ordered, adjudged and decreed that the accounts heretofore taken in this cause be rectified and varied, both as to the principal and interest, conformably to this decree: and that, in all other respects, the same stand confirmed; but that, for so varying and rectifying the said accounts, the parties in this cause shall respectively be at liberty to charge and discharge, as is usual in taking of accounts before a master ; and that the master to whom the accounts shall be referred, shall have the powers for that purpose specified and set forth in the said first-mentioned decretal order of the 27th day of June, 1815.
*And it is further ordered, adjudged and decreed that the final decree made by the Court of Chancery, on the 15th day of June, 1818, be reversed, and that the question of costs in the said Court of Chancery, and all further directions as to the final decree in this cause, be referred back to the said Court of Chancery. And it is further ordered, adjudged and decreed that this cause be remitted to the Court of Chancery, to the end that the said court may act therein as may be just and proper.
Decree of reversal accordingly. (a)

 In this case, (3 Johns. Ck. Rep. 77.) the chancellor went into a full examination of the decisions of the English chancery, on the question, how far the wife was to be considered as a feme sole, in regard to her separate property settled to her separate use; and he concluded that the English decisions were so floating and contradictory, as to leave the court here at liberty to adopt the true principles of these settlements, which he stated to be that the wife, as to her separate property, is to be deemed a feme sole sub modo only, or to the extent of the power clearly given by the settlement. That her incapacity is general, and the exception was to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of the law, that the intention was to govern, and to be collected from the terms of the instrument; and her power of disposition must be exercised according to the mode prescribed in the deed or will, under which she becomes entitled to the property. That, therefore, when she has a power of appointment by will, she cannot appoint by deed ; nor, when she is empowered to appoint by deed, is the giving a bond,7wtc, or parol promise, without reference to the property, or making a parol gift, such an appointment; nor, when it is said, in the settlement, that she is to receive from the trustee the income of her property, as it may, from time to time, become due by anticipalion, dispose at once of the whole income. But the decision of the Court of Errors, in this case, does not confirm these restrictions, further than they are specified, in express and positive terms in the deed of settlement. 1 Johns. Dig. 260. See also Udall v. Kenney 3 Cowen's Rep. 590.