PEARSON, J., dissented.
Upon the pleadings and proof the following case appeared:
On 11 May, 1835, Frederick Ward conveyed a negro girl, Jinny, to Thomas Ward, "in trust to and for the separate use of Nancy Harris, the wife of William Harris, and free from any control of the said William, during the natural life of the said Nancy, and upon the death of the said Nancy upon further trust to hold the said negro and her increase to the sole and separate use of Elizabeth Ledbetter, the wife of Richard Ledbetter, and Sally, the wife of John Scorey, both to be equally interested in said trust; and upon the happening of the death of the said Elizabeth or Sally or both, the said Thomas is to hold the said negro and her increase for the benefit of their children; one-half to the children of Elizabeth and the other half the children of (112) Sally." Elizabeth Ledbetter and Sally Scorey were the daughters of William and Nancy Harris. The negro girl was in the possession of Harris and wife; and, in March, 1838, William Harris, being much indebted and judgments rendered against him for debts for which his sons-in-laws, Ledbetter and Scorey, were bound as his sureties, William Harris and his wife, Ledbetter and his wife, and Scorey and his wife sold the negro woman and one of her children, then six months old, to the defendant, Herbert Harris, for the price of $700, and those six persons made a deed to said Herbert for them, with a covenant of general warranty; and he took them into his possession. He paid the consideration money partly in discharge of the debts mentioned, partly to William Harris, and partly to Ledbetter by the direction of the other vendors. Scorey and wife have four children; and in September, 1841, this bill was filed by Mrs. Harris, Mrs. Ledbetter, Mrs. Scorey and her four children, against Herbert Harris, William Harris, Ledbetter, Scorey, and Thomas Ward, and charges that Herbert Harris knew of the existence and contents of the deed made by Frederick Ward, and that, with such knowledge, he purchased the negroes from William Harris for an inadequate consideration, and that, supposing that he could make his title good thereby, he, by pursuasions and false suggestions and promises and undue influence and control over them, caused and procured the plaintiffs, Nancy, Elizabeth and Sally, *Page 85 
and their husbands to sign the deed for the slaves — Ledbetter being induced to do so by receiving a part of the purchase money, and the said Scorey by getting to himself another child of Jinny, then in his possession. The prayer is, that the defendant, Herbert, may be compelled to surrender the slaves and their increase and account for the hires, so that the purposes of the deed of settlement may be performed and for general relief. The answer of Herbert Harris denies all the (113) allegations of fraud and undue advantages, sets forth the terms and purposes of his purchase, and the conveyance to him, and insists on his title thereby acquired.
The plaintiffs have failed to establish any extraneous circumstance to impeach the conveyance to the defendant. Indeed, the allegations of the bill are expressed in such general terms, that one must suppose that no relief could be expected on them; and that it was intended to put the relief on the ground, that the conveyance by a married woman of a slave, held by a trustee to her sole and separate use, is inoperative. The opinion of the Court, however, is to the contrary; and we hold that a feme covert entitled to a separate estate in personal property, unless there be some clause of restraint of her dominion, may convey it and do all other acts in respect to it in the same manner, as if she were a feme sole. That is the settled law of the Court of Equity in England, and was, long before the revolution; and it is therefore obligatory upon the Courts here, just as much as any other established rule of property, derived from our ancestors. To go no further back, it was unquestionable law in Lord Hardwicke's time. In Peacock v. Monk, 2 Ves., 191, he points out the difference in that respect between real estate, and personalty, or the profits of real estate, which in fact is personalty and goes to the executor; and he gives the reasons for the difference. As to personal property, he says, where the wife has a separate use in it, "she may dispose of it by an act in her lifetime or by will. She may do it by either, though nothing is said of the manner of disposing of it" — that is, in the settlement, or articles. That has never been denied in England from that day to this, though the grounds of the rule have been (114) often stated in subsequent cases, and the principle itself more distinctly explained. In Fettiplace v. Georges, 1 Ves. Jr. and 3 Bro. C. C., 8, it was, for example, stated in terms, that personal property, settled or agreed to be settled to the separate use of a married woman, may be disposed of by her as a feme sole to the full extent of her interest, although no particular form for doing so is prescribed in the instrument. The *Page 86 
principle of that rule is, that she takes separate property as hers exclusively, with all the rights and incidents of property; of which one, and a most important one, is the right of disposition. This principle has been applied to all cases since, in whatever form they may have arisen. Thus she may convey personalty in which she is entitled in a separate use in reversion, as well as a present interest. Sturgis v. Corp., 13 Ves., 190. She may sell or give even to her husband, since in respect of that property they are regarded as distinct persons, like other strangers; though the Court will scrutinize such dealings upon a natural suspicion of actual constraint on her. Powlet v. Delavet, 2 Ves., 663;Squire v. Dean, 4 Bro., C. C., 36. She may not only convey her separate property, but, without the consent of her husband or trustee, she may encumber it by mortgage, or charge it by contracting debts, as by giving a bond for so much money merely. Fettiplace v. Georges, andHalme v. Tenant, 1 Bro. C. C., 16, 2 Dickens, 560. Other instances need not be cited as evidence, that, in the last case, Lord Thurlow laid down the rule as correctly as he did explicitly, which he took fromPeacock v. Monk, supra, that a feme covert, acting in respect of her separate personal property, is competent to act in all respects as if she was a feme sole. He says, it was impossible to say the contrary. Now, beyond all controversy, the ground of that rule is not any capacity or power supposed to be imparted to a married woman by her husband (115) or by the instrument creating the separate use as a capacity or power, thereby creating and subsisting by itself apart from the property; but it arises out of the ownership of the property, and the right such absolute ownership imparts to the person, to do with it as she pleases. When equity adopted the principle, allowing that separate property might be vested in a married woman, which the law denied, it followed, as being inherent in the jus proprietatis, that there should be the jus disponendi. That is declared in all the cases to be the principle; and there is no contradiction among them. Even when a gift is made in general terms to the sole and separate use of a feme covert, and the instrument goes on to add, that she may dispose of it in some particular manner, as by deed or will, yet she may do so in another manner by reason of her general property, in which the power is merged. Elton v. Sheppard, 1 Bro. C. C., 532; Hales v. Margerum, 3 Ves., 299. Such being the nature of a feme covert's right to dispose of her separate property — conferred by equity, not created by the settlor — the doubt was, whether any restraint upon the right of alienation by the provisions of the deed was admissible. Upon principle, it, unquestionably, was not; because the common law denies such a restriction, and in respect to equitable estates the general rule is, that equity follows the law. But this anomaly was admitted by *Page 87 
the Court of Equity, in order the more effectually to protect the wife from the control or solicitations of her husband, and thereby make the separate property a more effectual provision. As was observed by Judge Gaston, in Dick v. Pitchford, 21 N.C. 480, the controversy upon that point is settled by authority in England in the cases cited by him. But that very controversy only shows more conclusively, that, but for provision in the instrument in restraint of the anticipation of profits or alienation of the capital, the right of disposition existed as an absolute right belonging to the owner of the property. Is there any (116) reason, why the Judges of this Court should not hold the law to be the same here; or, rather, why we should not be obliged so to hold? There seems to be none whatever — no plausible ground for setting up a new rule upon their own arbitrary will. If there had been any legislation on the subject, at all incompatible with the law our ancestors brought with them: if there were anything in those rules repugnant to or inconsistent with the form of government, as it is expressed in the statute, respecting the parts of the common law to be in force here, then the Judges ought to conform and mould the rules to correspond, by proper qualifications. But we are not aware of any such legislation or repugnancy. On the contrary, the Courts of this State have heretofore proceeded on the idea, that they were to administer the law upon this subject, as they found it, as in other instances. In Dick v. Pitchford, just quoted, this doctrine of equity is recognized, and used as illustrating the question then before the Court, which was the right of a male cestui que trust to assign the trust fund, though, by the terms of the deed, the trustee was to apply the profits annually to his use. In other cases of creditors, seeking satisfaction out of a trust fund, intended to be tied up beyond the control of an improvident cestui que trust, it has been said, that the only instance, in which such a provision could hold, was in that of a married woman; thus implying that, without the provision, there would be no restraint on her. Again, so far from considering the separate property of a married woman susceptible of transfer, under the idea of her executing a power, it was held in Miller v. Bingham,36 N.C. 423, that, when property was thus conveyed during the marriage of a feme, the separate use itself ceased ipso facto, upon the determination of the coverture, and was converted into an ordinary trust for the feme, and so vested in her second husband. And inFrazier v. Brownlow, 38 N.C. 237, the general principle was (117) declared, as derived from Halme v. Tenant, and other cases, that debts contracted by a feme covert, in reference to her separate personal property, bound such property in the hands of her trustee, and satisfaction of the debt was decreed out of slaves held to Mrs. Brownlow's separate use, though the deed for the slaves contained no power *Page 88 
to her to charge debts or aliens. Let it not be said, that the slaves were the produce of the profits of the land, which were at her disposal, and therefore that the creditors had a right to follow those profits in the slaves, in which they were invested. That was not the principle of the decree or of the opinion given. On the contrary, the relief proceeded simply and exclusively on the fact, that the slaves were purchased and held by the trustee to her separate use. In Newlin v.Freeman, 39 N.C. 312, it was expressly held, that the circumstance of the investment of the wife's separate money in other property can have no effect, and that the property thus purchased will be treated, as if it had been deprived in any other manner: that is, that its nature will depend on the nature of the conveyance taken for it. In that case, accordingly, land, which was bought with the separate money of the wife and conveyed to a trustee for her, but not to her separate use, and without a power to her to devise it, could not be disposed of by her will, though the marriage articles authorized her to devise the land she had at the marriage and also all her personal property. Besides, how does she get the right to dispose of the profits more than the capital? If it be said, that the perception of the profits is the use given to her, the answer is, that the use secured to her is as much the use of the capital as of the profits: all consisting of property the same in kind, namely, personalty, and therefore each must be equally at her disposition. It is clear, therefore, that Frazier v. Brownlow proceeded upon the general principle, that, as to separate personal property, the lady was a (118) feme sole, and therefore equity would lay hold of that property for the benefit of her creditors — at least where she charged the debt on it. If, in that case, after purchasing the slaves with her own money, she had taken the conveyance to herself or to a trustee for her simply, and not expressing it to be for her separate use, there can be no doubt but they would have belonged to the husband. But, when she took a deed to a trustee to her separate use, then, without any regard to the source from which the purchase money was derived, the slaves, as her separate personal property, and, as such merely, were charged with her debts and became liable to be sold for their satisfaction, as an incident of ownership, as legal personal property, may be taken at law by execution. That case is, therefore, a precise authority, that, in respect to such separate property, a married woman is held here, as in England, to act as a feme sole. Hence, if the Courts here had been at liberty formerly to pay no respect to the principles so long settled in the mother country and to invent a new system for use here, it seems clear, that, upon every principle on which judicial precedents obtain authority, the series ofdicta and decisions in this State should be conclusive with the present Judges. It is said, indeed, that a contrary course has been *Page 89 
followed in some of our sister States. But, we believe, not after many adjudications had been made conformably to the old law. In New York, it is true, that it was once held, that a married woman was not to be deemed a feme sole in respect to her separate property, save onlysub modo and to the extent and in the manner prescribed in the instrument creating the estate. Methodist Church v. Jaques, 3 John C. C., 78. But even the authority of Chancellor Kent's great name could not uphold that position; and, upon appeal, the decree was reversed in the Court of Errors upon the opinions of the most eminent Judges. 17 John., 548. Since that time, by various judgments of the (119) Court of Errors and Chancellor Walworth, the old doctrine is reestablished in its integrity. In South Carolina it seems to be settled otherwise, it must be admitted. But that seems to have been upon the authority of an early case in that State, Ewing v. Smith, 3 Dessaus, 417, reversing a decree of Chancellor Dessaussure founded on full research into the cases on this subject and their reasons. It is true that Judge Harper, in Reid v. Lamar, 1 Strob., 27, speaks of the restriction on the right of the feme to dispose of her property except under an express grant of power, as more in conformity with the policy on which the right of separate property to the wife was allowed in equity. But he means only thereby, that it the better protects the interests of the wife, and not that it is against the public policy, that a married woman should have the right of disposition. He could not mean the latter; for, if that were true, then even the most express grant in the settlement would not confer the power, since the law never suffers the acts of parties to defeat its policy. Yet he admits and no one can deny, that at all times a married woman has been capable of executing a power, and that for her own benefit as well as that of another. And the late Mr. Justice Story, subsequently to all the American adjudications, states the old rule of equity as being yet the rule, without any qualifications from those decisions. 2 Story Eq., s. 1389 et seq. It is in fact, then, not a question of policy, but simply a question of construction of the instrument creating the estate: Whether, when it conveys property to the separate use of a married woman, it means to restrain her right of alienation, as incident to ownership, when it expresses no restraint, or only when the intention to restrain is declared in the instrument. It might have been contended, with some apparent reason, to be against the policy of this country and the habits of our domestic relations, to allow separate equitable property in a wife, at all. But it is too late to think of that; and it is, moreover, altogether a different question from (120) the present. Being allowed, the dispute now is as to the meaning of the instrument. This dispute is, therefore, merely as to the form of conveyances or agreements for the separate use of the feme covert, and *Page 90 
does not in the least concern the policy of the law or the institutions of the country — since, by express provisions, the parties may undoubtedly confer the power of disposition or restrain it. That being the true nature of the question, it would seem to be too much like unsettling the forms of conveyances and the rules of property to say, contrary to a very old rule of construction, that the parties intended to restrain alienation, though they do not say so. It is enough to fetter an owner, when the donor says, he does not mean she shall dispose of the property, but only enjoy the profits during her coverture or life. Suppose a parcel of chargeable or sick slaves to be a married woman's separate property and all her property. How are they to be fed, clothed, or cured, unless debts can be contracted on their credit, or some of them may be sold? Yet upon the doctrine, that she can move only under a power, she is perfectly helpless, and the slaves must be left to their fate of destitution or death or an exception must be admitted, which shows that there is either no general rule, or one to which exceptions may be arbitrarily allowed, without regard to the supposed meaning of the deed and intention of the parties.
The plaintiffs, therefore, who are married women, are concluded by their deed, which in this Court is considered as passing all their estate; and, as no relief is sought except against the deed, the bill must be dismissed with costs.