O’Neall, J.
The determination of this ancient and vexatious case, on grounds satisfactory to the parties, is hardly to be expected; but it is to be hoped, that it may be sustained by such reasons, as will satisfy the bar and the intelligent disinterested community, who have taken so deep ^interest in it. This hope is expressed, not with a view fo deprecate censure, or to prevent a critical examination of our judgment; but from a feeling, which has been eloquently described by ©ur learned, venerable, and amiable Chancellor (De Saussure) when he said in this very cause, that “ next to doing justice, the greatest consolation of Judges, is so to administer that justice, as to satisfy the parties that the merits of their causes have been fully brought out, loell considered, and impartially decided. ”
It is first to be examined and determined whether the ’ appellant has how the right to go back beyond the decree of Chancellor James, at June Term, 1822, and that of the Court of Appeals in Equity affirming his decree, at December Term, 1828. This will depend upon the character in which they are to be viewed ; if they are together a final judgment in the cause, then there can be no doubt that the appellant will be estopped. But if they have not this character, then they cannot preclude the appellants from examining the whole case
The distinction between a final and an interlocutory judgment has not been heretofore generally understood; and the Court have been again and again embarrassed in determining on the question whether the party had the right to appeal, which has been supposed to depend on the question whether the decree was interlocutory or final. On looking into the Act of 1808, 1 Brev. Dig. Tit. 58, sect. 63, I am perfectly satisfied that a party has the right to appeal from “ any order or decree of any Judge presiding on the Circuit.” The words quoted are those used in the Act when speaking of and directing the maimer in which appeals are to be taken. The distinction between interlocutory and final orders or decrees is not noticed, and a general right of appeals is plainly given from any order or decree from which any person may wish to appeal. The circumstance, therefore, that Chancellor James’s decree was appealed from and affirmed by the Court of Appeals, does not aid us in giving character to the judgment. Both may be interlocutory only.
In the case of Travis v. Waters, 1 John. Ch. Rep. 88, Chancellor speaking of a decree which he declared to *be a final one, said, “ It was made upon the coming in of the Master’s report, ascertaining the lands to be conveyed, and the balance to be previously paid. It was the final end and closing of the controversy, and was *309 analogous to & final, as contradistinguished from an interlocutory judgment at laiv.” This concluding illustration of Chancellor Kent seems to me to point us to the true conception of a final decree. Every one having only a slight acquaintance with legal proceedings, knows that at law an interlocutory judgment is predicated upon the default of one of the parties, and determines that the party in whose favor it is rendered is entitled to recover. But it may, as of course, be opened and set aside on terms in some cases — in others it is final as to the right to recover; but the extent of the recovery is yet to be ascertained. Keeping this illustration in our minds we should class interlocutory orders or decrees into two kinds. 1st. Those which are of course to be opened and set aside on a party applying to have it done and complying with the usual terms ; 2d. Those which fix the right of the party to recover, and which cannot be vacated by the Chancellor, but which still require something farther to be done in order to ascertain and fix the nature, amount, or quantity of the recovery.
The case of Travis u Waters, was for a specific performance of a contract, for the sale of land, and for an account. “ In October, 1808, the Court decreed a conveyance of part of the premises, and directed a Master to take an account of the quantity to be conveyed, and of the payments, and to ascertain the balance due, if any, to the defendant; that the same he paid, and that the conveyance thereupon be made ; and the question of costs was reserved until the coming in of the Master’s report. From this decree there was an appeal to the Court of Errors, and the decree was affirmed.” The question was, whether this decree, or that of 1813, upon the Master’s report, made up under its direction, was the final decree ? The Chancellor, as I have before said, held the latter to be final, and in declaring his judgment, assigned the reasons which I have already quoted. Speaking of the decree of 1808, he said, it “ cannot be so regarded, (i. e. as a final decree) for though the right of *a specific performance was declared generally, yet the extent of that right and the conditions upon which it was to depend, were not ascertained.” An appeal was taken from this decision of Chancellor Kent, and his decree affirmed by the Court of Errors, 12 John. Rep. 500.
In the case of the Methodist Episcopal Church v. Jaques, 1 John. Ch. Rep. 450, decided in June, 1815, the decree declared the principles on which the account should be taken, viz. : 1st. That the marriage settlement of the 25th of September, is valid and binding; 2d. That the defendant, J. D. J., should account for the whole personal estate of his wife, which came to his hands, but without interest; 3d. That he should account for the rents and profits which he received of her real estate, including the leasehold and freehold estate purchased in by him, under the operation of Heyl’s mortgage. 4th. No allowance was to be made to the defendant, J. D. J., for the maintenance of his wife and family, during the coverture. 5th. That the real estate left by Mrs. Jaques, including the lands in which the Chancellor, under his third head, had set up a resulting trust in favor of her estate, should be sold, and the proceeds brought into Court, to the end, that the same might be distributed according to the deed and will of Mrs. J. In 2 John. Ch. Rep. 543, September, 1817, the cause came again before the Chancellor on a *310 collateral question of practice, in relation to the evidence taken before the Master; and in 3 John. Ch. Rep. 1, a disposition of part of the fund in Court was decreed. In 3 John. Ch. Rep. 77, (in October and November, 1817,) it was again presented to the Chancellor, on exceptions to the Master’s report. Some of the exceptions were allowed, others disallowed. In the course of his decree, he examined the question, what power of disposition a feme covert has over her separate estate, and decided that she was to be considered a feme sole, to the extent only of the power given her by the marriage settlement. The case was re-committed to the Master, with instructions: he reported in conformity thereto ; and in June, 1818, there was a confirmation generally. The defendants, J. D. J. and R. J. appealed from this decree, and in January, 1820, the cause was heard in *the Court of Errors, 17 John. Rep. 548. A preliminary objection was interposed, which raised the question, which is the final decree in the cause ? It was held by all the Court, that the decree of June, 1818, was the final decree. Ch. J. Spencer, (at page, 559,) said, “ an appeal from a final decree opens for consideration all prior or interlocutory orders or decrees any way connected with the merits of the final decree.” This rule was concurred in by the whole Court, and the appellants were heard on the whole cause. The Court reversed the Chancellor’s decisions in various respects, holding that a feme covert, in respect of her personal estate, is to be regarded as a feme sole in Equity, so far as regards her power of charging or disposing of the same, unless specially restrained by the instrument under which acquires her separate estate. From the leading error of the Chancellor, in this respect, (as the Court held it to be) they deduced the corollaries that the Chancellor had erred, in the 2d, 3d, 4th and 5th heads or principles of the decree of 1815, directing the account, or so much of them as went to charge the hnsband with money or property, given by the wife to the husband during coverture — to establish a resulting trust in the lands purchased with the proceeds of choses in action, once belonging to the wife, -but given by her to her husband ; or to disallow the defendant, J. D. J., for the maintenance of his wife and family during the coverture ; the wife having clearly agreed to bear the expense thereof out of her separate estate.
From those authorities, it would hardly admit of a question, that the last decree (that of Chancellor Harper) in this case, was the final decree ; and not the decree of Chancellor James, and that of the Court of Appeals affirming it. For, by the latter, (Chancellor James’s decree,) it was decreed, that as the defendant, Nesbit, had sold all the negroes but one, “that he do deliver up that one to the executor, pay for the other negroes, according to their value at the time of his purchase, and their hire, and the hire of the negro retained, from that time to the present time and “ that the case be referred to the Commissioner, to ascertain the value and hire of the said negroes.”
*This decree, so far as it related to the value and hire of the negroes, is like that in the case of Travis v. Waters In both a general right of recovery is established, “ yet the extent of that recovery” is “not ascertained.” Compare, however, this case, in this respect, with the case of the Methodist Episcopal Church v. Jaques, and it seems to me that the decree (of June, 1815) in the latter went further to fix and *311 establish a right of recovery, than the decree in hand. For it will be remembered that it declared a resulting trust in-the land purchased by the defendant, J. D. J., and directed it to be sold, and the money brought into the Court to be distributed according to the deed and will of Mrs. J. This was certainly as final as that part of Chancellor James’s decree, directing the delivery of the negroes. For the decree establishing the resulting trust, denied the equitable title to be in J. D.»J., and the decree of sale a direction for distribution, established the rights of the complainants. The reference in each case was, however, necessary to enable the Court to “ end the controversy,” and all the decrees prior to the decree confirjning the Commissioner’s report, are to-be regarded as not conclusive of the right of the parties to re-examine them on appeal. For the appeal from the final decree, “opens for consideration all prior or interlocutory orders or decrees any way connected with the merits o’f the final decree. ”
But it was supposed in the argument, that the fact that the case had been adjudged by the Court of Appeals in Equity, was conclusive of the rights of the parties. Independent of the reason which I have already assigned, why the decree of the Court of Appeals cannot give character as a final decree, to Chancellor James’s decree, it may be remarked that in Travis v. Waters, a decree of affirmance by the Court of Errors, in New York, (which is there as well as the Court of Appeals is here, the Court in the last resort) was held not to be final, and it would, of course, be examinable on an appeal from the final decree.
I agree with the respondent’s counsel, that if the decree could be regarded as a final decree, that it never could be again examined, either by appeal, by a bill of review, or a *re-hearing. Haskel and others v. Raoul, 1 M’C. Ch. Rep. 22; Perkins v. Lang, 1 M’C. Ch. Rep. 30, note; Carr v. Green, Carolina Law Journal, 371. The Court of Appeals, under the Acts of 1808 and 1824, is the Court in the last resort; and like the House of Lords in Great Britain, and the Court of Error in New York, a decree by it of affirmance or reversal of a final decree, cannot be examined by a bill of review, or on a motion for rehearing, for error in matter of law, apparent on the face of the decree. In such a case there can be no appeal to bring the decision in question, for the controversy is ended. But if the decree of the Court of Appeals does not end the controversy, and still leaves someting to be done, to enable the Court to pronounce a judgment, it will be examinable on an appeal from such final judgment.
In the case of Harrison v. Jenkins, decided December Term, 1828, at Columbia, the defendant did not appeal from the decree of the Chancellor, directing the land in dispute to be delivered up, and the defendant to account for the rents and profits. When the account for the rents and profits was about to be taken, the complainant entered a disclaimer for the-rents and profits, and then the appeal was entered. It was held that the defendant was not bound to appeal, until the account for rents and profits had been taken ; and in that case, which is one of vast importance to the profession, and ought to have been long since published, Judge Nott, on the question as to the party’s right to appeal, makes'the. following remarks, “I think that, generally, where the object of the bill is to obtain the possession of a specific property, the party may and perhaps *312 ought to appeal from the decree, and not to wait the event of a reference to take an account of hire, or rents and profits, which are mere incidents that necessarily follow from the decision of the principal question. Perhaps he may not lose Ms right by thus waiting, unless some change of property or circumstances would render it improper for the Court to interfere ; or, unless by some act or acquiescence of the party, he may have waived his right. But in a case like this, where the Court has no jurisdiction of even a fibre of the *case, he will be entitled to appeal as long as there is a fragment on which he can lay hold.”
The case of Harrison v. Jenkins, it seems to me, is decisive of the question we are considering. The Act of 1808, after directing that the Circuit Court of Equity should be held by any one of the five Judges who were by it clothed with equitable powers, provides “that the orders and decrees of the said Judges in all cases wherein appeals shall, not be made to the Court of appeals, hereinafter established, shall have the same effect with decrees sanctioned by the Court of Appeals.” The defendant has lost the right of appeal from the circuit decree, directing the land to be delivered up, by not giving notice of his appeal in due time, and on this account the case had been struck from the appeal docket, at Spring Term, 1828. The circuit decree, according to the Act of 1808, was entitled to have the same effect as if it had been affirmed by the Court of Appeals. In that point of view, the right to appeal from the final decree, on the account for the rents and profits, whether the account was taken or disclaimed, would, if pursued, open all prior decrees, whether of the Chancellor or Court of Appeals, for consideration, and according to the most just, righteous and legal result of that case, all prior decrees might be reversed.
So long as a decree operates merely as authority, or as the reasoning of the Court to prove the party’s right in whose favor it is pronounced, it may be reviewed and reversed yvhenever it comes up properly before the Court of Appeals in any of the subsequent stages of the case. Hall v. Goodwyn, 4 M’C. 442; Peyton v. Smith, Ib. 476; Dunlap v. Crawford, 2 M’C. Ch. Rep. 171; Lenoir v. Silvester, 1 Bail. 641; Rose v. Tidyman, in equity, February Term, 1832, Charleston. The decrees of Chancellor James, and of the Court of Appeals in equity, being not final, are = to be regarded as authority constituting a strong reason why the complainants are entitled to recover; but examinable on the appeal from the final decree. I concede to them not only the respect of authority, but also of the veneration and admiration with which I always have and a'ways regai’d several of *the names then composing .the Court of Appeals in Equity ; but still that both of those decrees are manifestly wrong, is, I think, so plain and obvious, that the only reason which can be given why it has so happened, is, because the case was never brought out before either the Chancellor or the Court of Appeals. Each decree is predicated upon a statement of facts, which, if the case had rested upon them alone, would have justified the decrees. But the bill itself stated other facts which rendered those on which the decree were based wholly unimportant, and which showed that Price, the executor had no right to recover the slaves, and that the only real controversy was between Rebecca Turner and the defendant, whether her *313 conveyance to Matbias Turner should be set aside as fraudulent. This question was not touched, not even hinted at in either of the decrees.
I shall now proceed to show that, taking everything for granted as stated in the bill, that Price, the executor has no right to recover. The bill, after setting out the will, and the fact that the witnesses refused to prove it, and that administration was granted to Rebecca Turner, who under the order of the Ordinary, sold the personal estate and purchased a considerable part of it — that subsequently the will was proved, and the executor, Price, qualified — that there were no debts against the testator — ■ that the Ordinary had decreed against Rebecca Turner as administra-trix, a sum of which she was in arrear on account of her administration, including the price of the negroes sold and purchased by her, refers to a copy of the decree filed as an exhibit, from which it appears, that “Joseph Price, executor of the estate of John Turner, returned the citation issued requiring the attendance of Rebecca Turner, administratrix of said estate, with an acknowledgment of the service, but refused to attend — and at the request of the executor, to find each legatee’s distribn-tory share of said estate under the administration, find her proceedings to stand as follows: An inventory was returned, but there were orders from the Ordinary to sell at different periods, the whole of the goods and chattels of the said deceased, which I suppose (says the Ordinary) to have been done, and the sale bills being returned of different sales amount to $4,308 15 ; deduct *one-third for the widow, leaves $2,812 10. There being twelve legatees, the twelfth part of that sum is $239 34, exclusive of expenses, ,there being no return thereof — which is each legatee’s distributive, which the executor ought to have the government of, agreeably to the returns of the administratrix, which is the decree of the Ordinary.” The bill also set out the conveyance by Rebecca to Mathias, which she alleges to be fraudulent and which has not been tried, and the sale by Mathias to Nesbit with notice.
In the case of Benson, administrator, v. Price and Byers, 2 N. & M’C. 577, it was held that the sale by Rebecca Turner as administratrix was valid. In that ease as well as the one before us, there was no fraud alleged on the part of the administratrix. In it Judge Oolcoek who delivered the opinion says, “when an administration which has been granted, is properly revoked, the latter administrator may sue the former, for money had and received, or in trover for any goods remaining in his possession by him converted or not duly administered. Any other doctrine would be fraught with the most monstrous inconvenience. The community who are not under the authority of judicial pow’er should be certain of protection in their rights.” In the case of Foster v. Brown, 1 Bail. 221, administration had been obtained by a fraudulent suppression of the will in which the executor as well as the administrators concurred ; at the administrators’ sale the slave in dispute was purchased by one of the administrators, from whose possession he went into that of the defendant, the administrator’s son-in-law. It was held that “all acts done in the due and legal course of administration are valid and binding on all interested, although it be afterwards revoked. Nor can the matter of obtaining the administration, whether fairly or fraudulently, vary the question.” To this I would add as another necessary conclusion from the facts of that case and the reasoning of my brother Johnson, that as *314 between the executor and the administrator, the fact that the latter .bought at his own sale would not, when he had bona fide parted with the possession of the slave, render the sale invalid.
Eh’001 these cases I deduce two conclusions, either of which *is fatal to the plaintiff Price’s right of recovery, as executor. The first is that if he pursued the property as unadministered assets of his testator, his only remedy was by action of detinue or trover at common law. For in this point of view he sets up a legal title, and for its enforcement he has plain and adequate remedy at law. That he could not recover at law, is no reason why he should come into Equity; unless there was some impediment at law which prevented the assertion of his legal title and which this Court could remove. ' He has stated none in his bill. For the fact that the administratrix might not be able to pay the dis-tributees or legatees their respective shares of the sum which she was in arrear, is no ground for the interference of the Court of Equity : it may be true, and the parties wholly remediless, and the Court of Equity might be unable to aid them. But if the administratrix was unable to pay, her securities in the administration bond we should legally presume to be sufficient for that purpose; and in the case before us it turns out that Nesbit, the very defendant sought to be charged by this bill with the value of the slaves, is the security of the administratrix: So there is nothing in law or fact in this respect to give color to the jurisdiction of the. Court. The second conclusion from the cases cited, is that Price’s legal-title as executor is defeated. It does not lie in the mouth of the executor to say to the administrator whom he may succeed, “you purchased at your own sale and therefore your title is defeated.” The legatees may if they choose say so : it is at their election whether the sale is to be set aside or supported. If the administrator had the slaves in possession the executor might be entitled to recover — his legal right would be paramount to that of the administratrix, on showing that she had not accounted for the price. But until then, according to Brown v. Foster, he could not recover. It can be shown that Price has no title to recover the slaves from the administratrix. For on looking through the proceedings it appears, that exclusive of her own share, she or Matthias Turner paid to the legatees more than the value of the slaves in dispute.
The conveyance by the administratrix to Matthias Turner is to be regarded as fair and bona fide, according to its *terms, until the contrary is shown, and for present purposes is conceded to be so by the former decrees. This was before the Act of 1824, and according to the case of Legge v. Magwood, State Rep. 116, her conveyance conveyed to the defendants the legal estate in the said slaves. This too at once ousts the executor’s title, Which is altogether a legal one. The legatees might possibly set up the trusts of the will against -the adminis-tratrix’s voluntary donee, or her alienee with notice.
If the purchase by the administratrix at her own sale may be set aside, it is equally clear that it may be confirmed. If the executor could have raised the question, the decree of the Ordinary, which as to him is conclusive, must be regarded as a confirmation of the sale. Conceding for the present, that the executor had the right to set aside the sale, and pursue the specific property — or to have an account for its value, he has *315 elected the latter, iu the account before the Ordinary, and is bound by his decree, which estops him from averring that the sale was void.
On the showing contained in the bill, that there were no debts against the deceased, the executor would have been bound in Equity to assent to the legacies. Rebecca, Ephraim and John, three of the negroes in dispute, were, by the residuary clause, bequeathed to Rebecca Turner “ during her natural life, for her support and maintenance.” In Equity she would be regarded as the owner of the slaves, and be entitled to the possession. If her conveyance to Matthias was bona fide, he too, and of course his alienee, would be entitled to the possession during the life of the said Rebecca. The bequest being for her support and maintenance, would not lessen her estate; to accomplish its purpose a sale might be necessary. It is true that her alienee, under the circumstances in this case, if his title alone depended upon her title as legatee, ought to be compelled to give security that the property should be forthcoming at her death. This, however, shows that if Price had been entitled to a present decree for John and Sarah, he was not for Rebecca, Ephraim and John.
The claims of the claimants, Price and Rebecca Turner, *are totally distinct and hostile, and ought never to have been united in the same bill. Indeed they present two totally distinct causes, requiring different proofs and different decrees; and on this ground, as Rebecca Turner’s case has been dropped and Price’s pursued, which is now found to be unsustainable, the bill might he dismissed. But, looking to the antiquity of the case, and the possibility that the errors of the case since 1822, are not to be attributed to the complainants, and especially as the defendant, Nesbit, in his brief and imperfect answer, did not make the objection that he was called on by the same bill J;o answer to two distinct cases, we shall dismiss the bill as to the complainant Price, executor of John Turner, and retain it for all other purposes.
It is said that Rebecca Turner or Matthias Turner paid to the legatees of John Turner, deceased, the whole or the greater part of their shares of the value of the said slaves. This fact makes it necessary that they if alive, or if dead their legal representatives, should be parties. On looking into the will, it appears that the negro man Job was bequeathed to John, and the negro woman Sarah, to Sally Turner, during their respective lives, and the residue of the estate to Rebecca Turner, and at her death to be equally divided among all the testator’s children. Sally Turner died before the bill was filed, and her interest under the will, passed, by the residuary clause, to Rebecca for life. John, I presume, is alive, but is a lunatic, he ought to be represented by his committee. Rebecca Turner, we are informed, is dead — it is therefore necessary that administration should be taken out on her estate, and a bill of revivor and supplement filed, before any other or further order or proceeding (save that which is about to be made) can be made in the cause. We abstain from any comment on the case, which may be made out under the bill of . revivor and supplement.
It is ordered and decreed that the decrees heretofore pronounced in this .cause be reversed, and that the bill, so far as Joseph Price, executor of John Turner, deceased, is concerned, be dismissed; that the bill for *316 all other purposes, be retained ;* and that the cause be remanded to the Circuit Court, with directions that upon administration being taken out on the estate of Rebecca Turner, deceased, and a bill of revivor and supplement filed by her administrator, to which the legatees of John Turner, deceased, if alive, or if dead, their legal representatives shall be parties, complainants or defendants, as they may elect, setting out the facts to which allusion has already been made, and requiring the present defendants to answer as to them, the cause be heard de novo on the bills, answers and proof, without any prejudice to any of the said parties from any of the former, decrees.
Johnson, J., concurred.