Scott, J.
In 1841, G-eorge Hardy died, testate, leaving as Ms legatees six minor children, among whom was a daughter named Margaret, who, in October, 1850, in the seventeenth year of her age, intermarried with the defendant, W. L. Yan Harlingen, a young man of respectable character and standing, but of limited means. Under her father’s will, she became entitled to something over ten thousand dollars, which, at the time of her marriage, was in the hands of the executor. Upon the suggestion of her guardian, in contemplation of the marriage, and shortly *prior thereto, the following agreement, prepared by the guardian, was executed by the parties:
“This agreement, made this day of October, in the year 1850, between William L. Yan Harlingen and Margaret Hardy, both of the town of Lebanon, witnesseth: That the said William and Margaret being about to enter into the marriage relation, thought it prudent to provide for the safety and integrity of the said Margaret’s estate, as left by her father’s will, and therefore havo mutually agreed that the said Margaret, after her marriage with the said William, shall have full and entire control of her *189 estate now in the hands of the executor of her father, J. M. Williams, Esq., and shall have the right to receive, receipt for, or draw orders for any sum or sums of interest or principal which may be at any time coining and payable on her portion of her father’s estate, and invest the same or any part thereof, as she may deem proper; or the said Margaret, at all times during her said coverture may, by writing, under her hand aud seal, authorize and direct any other person to receive, receipt for, and invest, as she may direct, any part of her said estate in as full and perfect a manner as she could if of full age and sole, and such receipt so made or authorized by the said Margaret shall be good vouchers to the executor aforesaid, or any other .person in whose hands her said estate may be at the time said receipts or orders are given; and at the decease of the said Margaret, her estate shall pass to her legal distributees and heirs, on her father’s side, subject, however, to any disposition that she may make by will. In testimony whereof the said parties have hereunto set their hands and seals, at Lebanon, Warren county, Ohio, on the day and year first above written.
“ Wm. L. Van Harlingen, [seal.]
“ Margaret Hardy. [seal.]
“ Attest, A. H. Dunlevt.”
“ This agreement, on the part of Margaret Hardy, entered into by my consent, and with my advice as her legal guardian.
(Signed,) “ A. H. Dunlevt.”
Mrs. Van Harlingen died intestate and without issue, in September, 1852.
More than nine thousand dollars of her distributive share of her father’s estate was drawn by her out of the hands of the executor, in various sums and at different times during the coverture, for which receipts were given to the executor in the name of herself and husband. This money was, from time to time, passed by Mrs. Van Harlingen into the Ijands of her husband, who invested a large portion of it in lands which ho purchased in Illinois, taking the title in his own name, and otherwise used the residue of it as his own.
*This bill is filed by the surviving brothers and sisters of Mrs. Van Harlingen, claiming as against the executor, the balance of Margaret’s estate still in his hands; and, as against Van Harlingen, claiming the funds thus received by him through his wife, and of which she made no disposition by will.
Their claim rests on two grounds: 1. On what is claimed to be *190 the express limitation of the antenuptial agreement; 2. On the ground of undue influence by the husband over the wife.
Hence, two questions arise: 1. Had Mrs. Van ^Harlingen the right to dispose of the money in question by gift to her husband ? and, 2. If she had this right, was it so disposed of as to make the gift valid ?
In regard to separate property of the wife, that is to say, property in which she has a “ separate estate,” by virtue of a marriage settlement, which excludes the husband from those rights in, and control over, the subject-matter of the separate estate, which would otherwise, at common law, be vested in him, as husband, the question has arisen, both in this country and England, whether, as to such separate estate, a married woman has full power of disposition except as specially restricted by the settlement; or whether-she has no power of disposition except as specially conferred by the settlement. Counsel in this case have, with much research, collected the authorities bearing upon this question, and have very clearly shown that the decisions in England have not been uniform on the subject, and that opposite sides of the question have been espoused by tho courts of the several states in this country. The general current of the English decisions would seem to establish the rule that a feme covert with respect to her separate estate, is to be regarded, in a court of equity, as a feme sole, and may dispose of her property accordingly, unless she is specially restrained by the instrumefit under which she acquires her separate estate..
Tho earliest reported case in this country arose in South Carolina, and was decided by Chancellor Desaussure according to this rule, upon a full review of the English authorities. Ewing v. Smith, 3 Desaussure, 417. But this decision was, upon appeal, reversed, the court, by a bare majority, overruling the *ehanccllor; and this final decision has been since followed in that state.
In New York the question first arose in the case of the Methodist Episcopal Church v. Jacques and others, 3 Johns. Ch. 78. Chancellor Kent, in that case, reviewed the English decisions, and regarding them as “ floating and contradictory,” held the true principle of these settlements to be that, as to her separate property, the wife is only to bo deemed a feme sole, sub moda, or to the extent of the power clearly given.
The decree of the chancellor was appealed from, and his decision *191 reversed by tbe court of errors — three senators only dissenting. 17 Johns. 548.
The English rule was thus adopted in New York, and so it has been in Virginia, at least as to personal property. West v. West’s Executors, 3 Randolph, 373; 2 Leigh, 183. And in North Carolina, so far as regards personal property. Harris v. Harris, 7 Ired. Eq. 111. So in Connecticut, Imlay v. Huntingdon,'20 Conn. 126; and in several other states. On the other hand, the doctrine of Chancellor Kent in the Methodist Church v. Jacques has been adopted in Pennsylvania. Lancaster v. Dolan, 1 Rawle, 231; Thomas v. Folwell, 2 Wharton, 11. Such is the rule in South Carolina, as we have seen, and perhaps in some other states.
This question has generally arisen under marriage settlements proper, by which the wife originally acquired the estate. It has frequently occurred in relation to real estate, which could only be transferred in the mode pointed out by statute. In most of the cases there were trustees in whom the provident grantor had vested the legal title to the property in question.
It is not necessary to determine what rule of interpretation and construction sound policy would require in such cases, except so far as the time, circumstances, or reasons are to be found in the case before us.
Where the instrument is a settlement made in favor of the wife by a third party, the grantor may, doubtless, subject his bounty to such conditions and limitations as his own prudence *may suggest; and in such cases Chancellor Kent’s rule might with propriety be adopted.
Were the subject-matter of the grant real estate, a question might well arise as to the wife’s power of disposition under the settlement, in any other than the statutory mode.
But in this case the property was personalty — it was money— the ownership of which might pass by verbal gift and transfer .of possession. In this money the wife had an absolute'property, derived from the will of her father, which imposed no limitation on any of the rights incident to such ownership. Having thus, prior to, and independent of, the antenuptial agreement, the unlimited power of disposition, the paper which is called the marriage settlement was executed by the parties. Reading it by the light of surrounding circumstances, their intention can scarcely be doubted. The guardian of Margaret mas a man of experience and prudence. *192 Thinking it possible, from his knowledge of the world, that Van. Harlingen might be actuated by mercenary motives in seeking the proposed matrimonial alliance, and might, after marrriage, squander the property and leave his wife to destitution, he suggested to his ward the propriety of an agreement which would secure to her the control of, at least, a part of the legacy which parental affection had provided for her support. With her approbation, he drew up an agreement which would have divided the property about equally between herself and husband. But Van Harlingen preferred that the whole should remain, after marriage, as before, subject to the-exclusive control of his wife; and at his suggestion the agreement was accordingly modified and made to assume its present form. The sole intention of the parties would seem to have been to' prevent the operation of the common-law principle which would have transferred, upon the marriage, all of Margaret’s personal property to her husband. This rule of the law the parties might, by previous contract, modify, or abrogate, so far as it applied to them.
Had the agreement simply provided that the husband should acquire no rights in the property by the marriage, and that the wife should hold it as a feme sole, notwithstanding the marriage, all the express terms of the actual agreement would have been *its legal results. No other person could impose restrictions or limitations upon her exercise of the full right of disposition resulting from the absolute ownership which was left in her. Any such restrictions could only be self-imposed, and, as against her, they are not to be presumed. No trust was created by this instrument; there was no attempt to vest the legal title in any third party; and the dominion of the husband being excluded, the wife, thus retaining the unqualified ownership, must be regarded as retaining therewith the absolute jus disponendi incident thereto.
Looking to the terms of the instrument, we find it to be mutually agreed between herself and Van Harlingen, “ that the said Margaret, after her marriage with the said William, shall have the full and entire control of the estate now in the hands of the executor,” etc., u and shall have the right to receive . . . and invest the same or any part thereof, as she may deem proper, . . . in as full and perfect a manner as she could if of full age and sole; . . . and at the decease of the said Margaret, her said estate shall pass to her legal distributees and heirs on her father’s side, subject, however, to an y disposition that she may make by will.” There is in. *193 this, no express limitation of Margaret’s interest to a life estate, or the use of the income merely; no indication of an intention to place-the capital or any part of it beyond her own control; and the parties do virtually stipulate that the whole and every part of it maybe used by her according to her own pleasure during life, and that, whatever portion of it she may retain till her decease, shall thereupon pass to her heirs, unless her will shall otherwise direct. We regard this simply as a declaration that the legal rights of the husband shall not attach to this property, either during the life of the wife, or upon her decease. As a consequence of this, it would, at her death, pass to her heirs if not otherwise disposed of by her.
Whatever diversity may be found in the decisions of courts as to a married woman’s power of disposition over her separate estate, we have found no case in which an antenuptial agreement, such as the one executed in this case, and having relation only to personalty, has been held to give the wife only a right to the ^profits or income for life, with a mere power of appointment by will as to the capital. Any such decision would certainly be at variance with the doctrine of the text-books.
. . . “ It may now be laid down as a general rule that all antenuptial [agreements for securing to a wife separate property,, will, unless the contrary is stipulated or implied, give her, in equity, the full power of disposing of the same, whether real or personal, by any suitable act or instrument in her lifetime or by her last will, in the same manner and to the same extent as if she were a feme sole.” 2 Story’s Eq. Jur., sec. 1390.
“ If the property is expressly given to a married woman to her 1 sole and separate use,’ without saying for life; and she is further-authorized to dispose of tho same by will; in such a case the gift will be construed to confer on her the absolute property, and consequently she may dispose of it otherwise than by will; for the absolute property being given, the power becomes nugatory and is. construed to be nothing more than an anxious expression of the donor that she may have an uncontrolled power of disposing of the property.” 2 Story’s Eq., sec. 1394. And to the same effect, 2 Bright on Husband and Wife, 242; Basford v. Street, 16 Ves. 135.
“ It is settled that an express negative declaration is requisite to deprive a feme covert of her prima fade right of disposing of her separate estate.” Hill on Trustees, 422.
“ It has also been decided that where the limitation is to a feme *194 covert indefinitely, with power to appoint by will, and in default of such appointment then to her executors, she has the complete dominion over the thing limited, and may appoint by any form of instrument during her lifetime, although the power of appointing be confined to one form, namely, a will.” Clancy’s Husband and Wife, 296.
Being satisfied, then, as we are, both from the language of the agreement and the surrounding circumstances, that it was not the intention of Mrs. Yan Harlingen to place her property, in any respect, out of her own control, but that the governing purpose was to retain the same dominion over it as though she had remained sole, we must regard her, in respect to this property, as *a feme sole, and concede to her the power of disposing of it at pleasure, by gift or otherwise.
Nor do any covenants of the- husband contained in the agreement, present an obstacle to his becoming the object of her bounty. He is not here asserting any marital right, but claiming as donee, under a power which the agreement conferred upon his wife.
There remains, then, but a question of fact in the case.
Were the funds in question disposed of by Margaret, during the coverture, by a valid gift of her husband ?
There is no doubt that courts should narrowly scrutinize cases of alleged gifts from the wife to the husband, and should promptly set them aside whenever there is good reason to believe that they have been procured by the improper exertion of that influence which the relation of the parties to each other puts in the power of the husband. The transaction will be viewed with a jealous eye on account of the péculiar facilities enjoyed by the husband for the exercise of an improper influence. At the same time undue influence is not to be presumed from the mere relation of the parties. It must be shown either by direct proof or by circumstances from which it may fairly be inferred.
It is not unreasonable to suppose that a husband may occupy a prominent place among the objects of a wife’s affection. And there is nothing apparent in this case to render it either surprising or improper that Mrs. Yan Harlingen should have given to her husband the money which, independent of the antenuptial agreement, would have become his by operation of law.
From the evidence in this case we may fairly infer that the in-termarriage of William and Margaret was induced by mutual af *195 fection. Indeed there is not a particle of evidence in the case tending directly to discredit the character or conduct of the husband. It was owing to his own remonstrance that the antenuptial agreement was not so drawn as to transfer to him. some 85,000 of his wife’s property There would seem to be no doubt that her confidence in and affection for him continued unabated till her death. If any reliance can be placed in the testimony, she knew well that the title to the Illinois lands was held by her husband *in his own name, and she was not only willing but solicitous that it should be so. Her husband had executed a will by which, had she survived him, all the property would have become hers; and she desired to leave no doubt of its being his if he survived her. This desire and purpose she expressed with frequency and earnestness to many of her intimate friends and acquaintances, to whom she stated her reasons for not wishing to give her property to her brother or sisters; reasons founded on the easy circumstances of some of them, and the improvident habits of others.
She was informed by attorneys whose advice she sought, that she could not make a valid will until she became of full age; and that if she united with her husband after she became of age, in executing a receipt to her father’s executor for the money which she had permitted to pass into her husband’s hands, and with which she knew he had purchased property in his own name, that the property would thus become absolutely her husband’s. She remained at Lebanon till she became of age, and executed such a receipt, avowing that her object was to secure the property to her husband. After her removal to Illinois, and during the last six months of her life, she repeatedly made similar declarations to her acquaintances there, as to the disposition she had made of her property in favor of her husband. Such are substantially the facts as shown by ten or twelve witnesses whose depositions have been taken by the defendant.
On the other hand, one single witness testifies to representations of a different kind, made to him by Margaret. That she spoke to him repeatedly of the importunities, not of her husband, but of his family and friends. Most of those representations are shown, by other witnesses, to have been untrue, if made; and several circumstances are disclosed by himself, which do not tend to strengthen our reliance upon his statements.
But independent of this, it would be strange that Margaret should *196 have disclosed to this witness alone, who was a stranger to her in blood, her real wishes and views in respect to her property, while she earnestly and persistently sought to create, and *keep up till her death, a different impression in the minds of all her other friends and acquaintances.
The mass of testimony leaves no doubt upon our minds that Mrs. Yan Harlingen gave to her husband the money which was drawn from the executor, intending to make it his property. No undue influence is shown, and the gift must, therefore, be held valid.
As to the residue of the legacy, still in the hands of the executor, and of which no disposition was made by Mrs. Yan Harlingen, the terms of the antenuptial agreement will pass it to the complainants.

Decree accordingly.

Hartley, C. J., and Swan, Brinkerhoee, and Sutliee, JJ., concurred.