T. W. Johnston, Respondent, *v.* Anne E. Gawtry et al., Appellants.

### January 3, 1882.

1. The state in which a note is made payable and in which it is delivered in consummation of a bargain, is the place of the contract, though the note is executed in another state.

2. In an equity proceeding, until the contrary is shown, it will be assumed that the equity doctrine of a sister state is the same as that of the forum, where both have an equity jurisprudence.

3. In Missouri, as to her separate estate, a married woman is a *feme sole;* and in an action in this state to enforce her foreign contract against her separate estate situated here, her power to make it and its validity are governed by the laws of the forum.

Appeal from the St. Louis Circuit Court, Adams, J. *Affirmed.*

J. M. & C. H. KRUM, for the appellants : Sureties, indorsers, and guarantors are liable only according to the law of the place where their contract is made. — Whart. on Confl., sect. 439 ; Story on Confl. 823, sects. 278, 279 ; *Aymar* v. *Sheldon,* 12 Wend. 439. This contract could not be enforced by the courts in New Jersey, because the statute prohibits its making. — *Vankirk* v. *Skillum,* 5 Vroom, 109 ; *Peake* v. *Lahan,* 6 C. E. Green, 269 ; *Woolly* v. *Sargent,* 3 Halst. 262 ; 2 C. E. Green, 234 ; 6 Vroom, 517.

BALDWIN, HAMILTON, & N. HOLMES, for the respondent : The place of delivery is the place where the note first became a complete contract, and is the place of the contract (wherever signed), and that the validity of the contract is to be governed by the law of that place (though the place of performance where it affects realty may prevail over the *lex loci contractus,* as will be shown below) ; and the law of the domicile or the place of signing, where that was in another state, is excluded. — *Lawrence* v. *Bassett,* 5 Allen, 140 ; *Lee* v. *Sellick,* 33 N. Y. 615 ; *Cook* v. *Litchfield,* 5 Sandf. 337 ; *Davis* v. *Clemson,* 6 McLean, 622 ; *Campbell* v. *Nichols,* 33 N. J. L. 83 ; Dan. Neg. Inst., sect. 868 ; Story on Confl., sect. 242. And the same doctrine governs in case of a married woman in respect of her capacity to contract ; the *lex loci contractus* (being that of the place of delivery) prevails over that of the domicile or place of signing, where that is in another state, and imposes an incapacity (as the *lex rei sitæ* also does where that is applicable). — *Pearl* v. *Hamborough,* 9 Humph. 426 ; *Nixon* v. *Halley,* 78 Ill. 615 ; *Adams* v. *Hanness,* 62 Barb. 336 ; *Bell* v. *Packard,* 69 Me. 110 ; Story on Confl., sect. 103. If there were any positive or statute law in New York going to the validity of a married woman's contract of this kind, different from or in conflict with our own equity doctrines on the subject, the burden of proving such law would rest upon the defendant asserting it ; but no proof was made of any such law of that

state ; and in the absence of such proof by the party assert-ing it, judgment passes according to our equity on the pre-sumption that both laws agree. — *Monroe* v. *Douglass*, 5 N. Y. 452 ; *Chapin* v. *Dobson*, 78 N. Y. 79 ; Westlake on Priv. Int. Law, art. 413 ; 11 Cl. & Fin. 85. On this mat-ter, then, of the validity of the contract in equity, we have only to look to the decisions of our own courts. They are so explicit and decisive as to leave no room for question.— *Whitesides* v. *Cannon*, 23 Mo. 457–472 ; *Tuttle* v. *Hoag*, 46 Mo. 43 ; *Schaforth* v. *Ambs*, 46 Mo. 116 ; *Miller* v. *Brown*, 47 Mo. 508. It is immaterial whether her con-tract charging her separate estate be for the benefit of her estate, or be as surety for her husband's debt, if such intention be proved. — *Whitesides* v. *Cannon*, 23 Mo. 457. The wife has the absolute power and ownership of a *feme sole* over her separate estate in equity, and is competent to make contracts, or contract debts, that shall bind it in equity, whether such estate be named or referred to or not. — *Miller* v. *Brown*, 47 Mo. 508 ; *Whitesides* v. *Cannon*, 23 Mo. 457. When it appears in evidence that a married woman put her signature to a note, and that she had, at the time, a separate estate settled upon her to her separate use, these facts alone raise a presumption that she contracted in reference to her separate estate, and intended thereby to bind or charge it for the payment of the obligation thus created.— *Tuttle* v. *Hoag*, 46 Mo. 43 ; *Schaforth* v. *Ambs*, 46 Mo. 116 ; *Morrison* v. *Thistle*, 67 Mo. 600.

BAKEWELL, J., delivered the opinion of the court.

This is a proceeding in equity to subject to the payment of the debt mentioned in the petition, certain real estate in St. Louis, the property of defendant Anne E. Gawtry, a married woman. The petition sets forth that the real estate described was, by the father of Mrs. Gawtry, devised to the co-defendant, her husband, in trust for Mrs. Gawtry's sepa-rate use ; that on May 1, 1877, at the city of New York,

the defendants, William M. Gawtry, as principal, and Anne E. Gawtry, as surety, made their note, whereby they promised to pay to Harrison Johnston, two years after date, $10,077.69 ; that Anne E. Gawtry became surety by signing her name on the back of the note under the words : " This indorsement being intended to charge my separate estate for the payment of this note ; " that defendant Anne, by signing as aforesaid, intended thereby to charge her separate estate, to contract in regard thereto, and to become surety for the co-maker of the note ; that, being a married woman, she could not, by the common law of New York, make a contract binding upon her ; but that, by the equity jurisprudence of that state, she had full capacity to contract as a *feme sole* in respect of her separate estate. The petition alleges a transfer of the note by indorsement and delivery before maturity, to plaintiff ; and prays for relief in accordance with these allegations.

The answer of William M. Gawtry (against whom no judgment is asked) is a general denial. The answer of Mrs. Gawtry is verified by her affidavit. She alleges that she resides in New Jersey, and has resided there continuously since 1872 ; that she signed her name on the back of the note, in New Jersey ; that when she did so nothing was written over her signature ; that she never wrote or authorized any one to write on the note the words set out in the petition which now appear on the note ; and that these words are not her act or obligation. Further the answer is a general denial.

The note in question is as follows : " $10,077.69. NEW YORK, May 1, 1877. Two years after date I promise to pay to Harrison Johnston, or order, ten thousand and seventy-seven $\frac{69}{100}$ dollars, for value received, with interest at the rate of seven per cent per annum, having deposited with him as collateral security for the payment of this note and two other notes dated this day, certain securities referred to in a receipt dated May 9, 1877, and signed by said Harrison

Johnston. WM. M. GAWTRY." On the back is written: "This indorsement being intended to charge my separate estate for payment of this note. ANNE E. GAWTRY." There is also an assignment without recourse to T. W. Johnston, or order, by the payee. And a writing by the clerk of the St. Louis Circuit Court showing that the note was filed in his office on May 30, 1879, and on May 8, 1880.

The only witness examined on behalf of defendants was defendant William M. Gawtry. There is an irreconcilable discrepancy between his testimony and that of the witnesses for plaintiff as to some matters which defendants claim to be material, and as to which it seems to be impossible that the contradiction could arise from defect of memory or mistake. Mrs. Gawtry was not examined. It does not appear why her deposition was not taken. Mr. Gawtry's testimony is that he and his wife and children reside, and have since 1867 resided, at Long Branch, New Jersey, and nowhere else; that, before that, they resided in New York, where he was in business up to 1872. Since then, he has been out of business, but has had desk room at 243 Broadway, New York. In the early part of May, 1877, witness had a settlement of accounts with Harrison Johnston, which was made by John H. Carnes, a common friend to both parties; and it was then agreed that Gawtry should give a note to Johnston for $10,077.69, dated May 1, 1877, at two years, bearing seven per cent interest, with the security of his wife's indorsement. Witness drew the note at his home at Long Branch, explained it to his wife, and, at his request, she indorsed it, nothing whatever, up to that time, being written on the back of the note. Witness then took the note to New York, and there, in the room where he had his desk, handed it to Carnes for Harrison Johnston, who was there in another room on the same floor. Carnes stepped out with the note, and returned in a few minutes saying that Johnston wanted written over Mrs. Gawtry's signature the words that now appear there. Witness doubted

whether he ought to do this, but, on reflection, wrote the words in Carnes's presence and handed back the note. The receipt mentioned in the note was, he thinks, handed to him on the same day.

Mr. Gawtry's testimony is not in all respects consistent with itself. He says, for instance, that he never told his wife that he had written anything above her signature until compelled to do so by the fact that she was sued. In a previous deposition he had said that he had told her of this about three months before that. He says, however, that he concealed it from her for some time, and that she was very angry when she heard of it. The discrepancy as to the time when he spoke to her about it, is such as is often remarked in the testimony of the most truthful witnesses. He says positively that he never, after 1867, held himself out as living in New York; but it appears that, as late as 1872, he so described himself in legal instruments written and signed by him. This, he says, was for the greater convenience of acknowledging these papers in New York, where his office was.

It is not disputed that Mrs. Gawtry had a separate estate in the property described in the petition; that she and Johnston knew this; and that Johnston accepted the note for value on the faith and credit of this separate estate.

Carnes, for plaintiff, testifies that he had once been the confidential book-keeper of Mr. Gawtry, but was employed as the agent of Harrison Johnston to transact the business of a settlement with Gawtry; that he got from a friend the words proper to be put above Mrs. Gawtry's signature to the note, and took them to Mr. Gawtry at his office, 243 Broadway. Gawtry, this witness says, then had the note in his hands, written and signed by him only, and then and there wrote the words on the back of the note, and left, to get Mrs. Gawtry to sign. She was then residing, according to this witness, with her husband at the house, 146 Fifth Avenue, New York, which Gawtry says they had left

many years before.    It would take about seventy minutes
to go there and return, and two hours to go to Long Branch.
Gawtry returned in about an hour and a half, with Mrs.
Gawtry's signature under the words on the back of the
note, and handed the note to Carnes, who delivered it to
Harrison Johnston in the adjoining office.

Harrison Johnston says that he received the note at the
date mentioned by Carnes in the condition described by
Carnes, and that a few months afterwards he saw Mrs.
Gawtry in her carriage at Long Branch, where she called
him to her, acknowledged her liability upon the note, and
said it should be paid if she had to make the money herself.

A document, called an extension agreement, dated June,
1879, was put in evidence, signed by Gawtry and his wife
and C. A. Johnston.    This was delivered to C. A. John-
ston, who is a son of Harrison Johnston, and recites,
amongst other things, that Gawtry had, on a settlement with
Harrison Johnston in May, 1877, transferred to him, *inter
alia*, the note now in controversy, which is described as
indorsed by Anne E. Gawtry, which C. A. Johnston agrees
to extend for one year, and assigns to her a mortgage
described, as collateral security for her indorsement.

C. A. Johnston swears that this document was signed by
Mrs. Gawtry, in the presence of himself and her husband,
in her carriage in front of 243 Broadway, New York; that
he then called her attention to the fact that, by this agree-
ment, he gave up all security but her indorsement, and
relied solely on that; that she said she understood its
terms, that she intended to pay it, and only wanted time,
and was then negotiating the sale of her property in St.
Louis.

Gawtry says that this agreement was signed by his wife
in New Jersey, where she lay sick; that she had not then
been in New York for many days; that Johnston never
spoke to Mrs. Gawtry about the note in his presence in a
carriage or elsewhere.    C. A. Johnston says that Gawtry

and wife lived in New York in the summer and at Long Branch in winter. He corroborates his father as to the fact of an interview with Mrs. Gawtry in her carriage at Long Branch, in 1877, but did not hear what was said at the time.

It was agreed that there is a common law and equity jurisprudence in New York. A provision of the statute of New Jersey was put in evidence by defendants, to the effect that any married woman may "bind herself by contract in the same manner and to the same extent as though she were unmarried, which contracts shall be legal and obligatory, and may be enforced at law or in equity by or against such married woman, in her own name apart from her husband; provided that nothing herein shall enable a married woman to become accommodation indorser, guarantee, or surety; nor shall she be liable on any promise to pay the debt or answer for the default or liability of any other person."

It should be said that it appears that suit was brought by plaintiff against defendants in St. Louis in May, 1879, and that the note was then filed. This action was begun in May, 1880, and the note was again filed. C. A. Johnston says that he had the note in his possession, and exhibited it to Mrs. Gawtry at his interview with her on June 12, 1879. It does not appear when the note was withdrawn from the files to be refiled.

The decree states that the court finds the issues for the plaintiff; that the amount due on the note is $12,546.71; that Mrs. Gawtry, by the note, charged her separate estate in the realty described in the petition which is held by her husband in trust for her separate use, and it is ordered that the same be paid out of the separate estate of Mrs. Gawtry in this property, and that so much of the same as may be necessary be sold.

We are of opinion that, upon the pleadings and evidence, plaintiff was entitled to the decree. The note was perhaps

signed by Mrs. Gawtry in New Jersey, and she probably resided there at the time. The general rule, however, is, that the place where a contract is made, depends, not upon the place where it is written, but upon the place where it is delivered as consummating the bargain. There is no doubt that the place of the contract therefore was New York. There is no evidence of any peculiar statutory regulation affecting the matter in New York. It is admitted that the common law, and a system of equity jurisprudence, are in force in New York. In regard to so much of the law as is not statutory in its character, at least, except where there is some notoriously peculiar domestic rule, the courts of one state of the Union assume, until the contrary is shown, that the law of any other particular state is the same as that of the one state in which the cause is being tried. Where the question is not of a state settled by colonists not from England, the presumption of identity of the laws will be applied, unless where the effect of the presumption would be to defeat the intention of the contracting parties; and can be only overcome as to the unwritten law by books of reports and cases decided, or, in some cases, by public history, public documents, or the oaths of persons instructed in the laws, customs, and usages of the foreign country or sister state, or certificates of persons high in authority. Story on Confl., sect. 642; 2 Phil. C. H. & E. Notes, chap. 5, sect. 4; 1 Whart. on Ev. (2d. ed.), sect. 314; *Averett* v. *Thompson*, 15 Ala. 681.

There is nothing in the present case to show that the equity doctrines in New York in regard to the power of a married woman to charge her separate estate, differ from those sanctioned by the supreme court of Missouri.

In the case at bar there cannot be a shadow of doubt under the evidence, that Mrs. Gawtry intended to charge her separate estate, and that she knew she had done so, if the testimony of Harrison Johnston and C. A. Johnston is to be believed. The stipulation of counsel shows that a

copy of this note and of the writing upon the back of it was delivered to her by the notary on May 3, 1879, more than a month before she signed the extension agreement. The true meaning of the written contract, and the only possible meaning of it, is, that she charges her separate estate, and she seems twice to have recognized this, and once to have recognized it in writing, by an instrument whereby she takes an assignment of a mortgage as collateral security.

In Missouri it is held, that a woman having a separate estate in land is, in equity, to all intents and purposes, a *feme sole* in regard to it ; and that she can execute a note in blank, and be bound by it as much as if she were a man. *Morrison* v. *Thistle*, 67 Mo. 600. In *Meyers* v. *Van Wagoner* (56 Mo. 115), the married woman gave the note for a debt of her son, in consideration that his note for the same amount be cancelled ; it was held, that the intention to bind her separate estate necessarily appeared from the mere facts that she executed the note and had a separate estate at the time. In *Metropolitan Bank* v. *Taylor* (53 Mo. 444), the note found to be a charge on the separate estate, was the joint note of the husband and wife. The doctrine long established in Missouri, in short, is that, whenever the married woman intends to contract a debt, she contracts upon the credit of her property ; that, as to her separate property, she is, in equity, a *feme sole*, and may bind it by her contracts, whether in writing or not, and whether the property be referred to or not. *Miller* v. *Brown*, 47 Mo. 504. The doctrine in Missouri is the doctrine now recognized in England, that the married woman is, in equity, a *feme sole* as to her separate property ; that this is liable, not only for her notes and bonds and bills, but for her general engagements ; that the instrument creating the debt does not operate as the execution of a power of appointment, and does not create a lien or charge upon the separate property, but that equity gives execution against her property, as does a court of law against the property of any other debtor. *Hooton*

v. *Ransom*, 6 Mo. App. 23; *Picard* v. *Hine*, 5 Ch. App.
274; *London Bank* v. *Lempriere*, 4 Priv. Co. App. 594.

In New York, also, it has been held that a *feme covert*,
as to her separate estate, is a *feme sole* in equity, and may
charge it with the debts of her husband. *Jacques* v.
*Church*, 17 Johns. 548. It may very well be that the
doctrine of the New York chancellors has not been uniform.
The English chancellors have not agreed as to the principles
upon which they have given the remedy against the separate
property of the married woman. But there is no evidence
before us that the doctrine of the Missouri cases on this
subject would be repudiated in New York; and if it be held
in New York that the intention of a married woman to
charge her separate estate must be expressed in writing,
that rule of evidence is not binding upon the courts of the
forum.

But the real property to be affected by this contract of
Mrs. Gawtry is situated in Missouri. We see nothing
whatever from which we can find that, on the evidence
presented, the trial judge erred in applying the Missouri
doctrine as to the contracts of a married woman to the case
at bar, nothing to rebut the presumption that Mrs. Gawtry,
in signing this note as joint maker, intended to give to the
holder of this note recourse against her real estate in
Missouri. The courts of this state clearly recognize that,
as to her separate estate, the married woman is a *feme sole;*
and we think that, whenever the married woman having
a separate estate in lands in Missouri, makes a contract
which, if made in Missouri, would be enforced in equity
against her separate estate here, her capacity to make it,
and its validity, when the attempt is made in this state
to enforce it against her separate estate here, is governed by
the laws of this state. Story on Confl., sect. 260; Whart. on
Confl., sects. 278, 280; *Frierson* v. *Williams*, 57 Miss. 451.
The case last cited, which is a recent and well-considered case,
was one of a promissory note, made, as in the case at bar, by

the wife as surety for her husband. The note was made in Louisiana, and by the laws of that state was void (as it was held to be void also in Mississippi, as a personal obligation of the wife); but, as the making of the note, though it passed no interest in the land in Mississippi, was the essential step for a judicial disposition of the estate, which, by contracting the debt, she had subjected to its payment, it was held that her capacity to make the contract must be determined, not by the law of her domicile, but by the law of the place where the real estate in question was situated, and that it could be enforced against her separate estate in land in Mississippi, utterly without regard to the fact that, by the law of Louisiana, where the contract was made, its execution might have had no effect upon the separate property of the wife in that jurisdiction.

But we think that the contract of Mrs. Gawtry, for the reasons stated, must be regarded as having been made in New York; and we have no evidence, and none was produced before the trial court, that, according to the New York system of jurisprudence, that contract would not be enforceable against her separate property. If made here, we think it would be enforceable. We think that the judgment of the circuit court should be affirmed. It is so ordered. Judge LEWIS is absent; Judge THOMPSON concurs.