Felkner v. Tighe et al.

---

## FELKNER V. TIGHE ET AL.

1. MARRIED WOMAN: *Not bound by title bond to convey land: Payments.*
   A married woman can not make an executory contract to convey land which will bind her or her heirs; but if her vendee, under such contract, should make payments on the land, such payments will be a charge upon the land, enforceable in equity, upon her refusal to convey. (Eakin, J., dissenting as to the disability of a married woman to make an executory contract to convey.)

2. PRACTICE: *Against unknown heirs.*
   Proceedings against unknown heirs are strictly construed.

3. SAME: *Compensation for improvements by vendee.*
   A purchaser by title bond from a married woman will not, upon her refusal to convey, be allowed compensation for improvements made by him on the land, further than as a set-off against the rents and profits.

APPEAL from *Lonoke* Circuit Court in Chancery.

Hon. J. W. MARTIN, Circuit Judge.

*G. B. Denison*, for appellant:

For the rule prior to 1874, see. *art. 12, sec. 6, Const. 1868; 29 Ark., 346, 650; 30 ib., 385, 727; 32 ib., 777; 33 ib., 432.*

The object of the *Constitution of 1874, art. 10, sec. 7*, was to confer upon *femme coverts* an additional means of acquiring property, by adding " grant " and power, and capacity, *to make present disposition,* by adding " conveyed." Before— without a statutory conveyance—she could only devise or bequeath. The *Constitution of 1868*, and *Gantt's Digest, secs. 838, 849*, and *act of April 28, 1873*, were all that was done toward removing her common law disabilities. The Convention of 1874 was familiar with the law and decisions under it (*13 Ark., 538–9*), and intended to still further relieve her, and gave her the right to acquire by *grant*, and to *convey* as if *femme sole.* She may convey without privy examination or joining her husband. She has the power of *present disposition* as fully as a *single man* has. If she can do this, she may bind herself to make a deed. (*2 Bish. Mar. Wom., secs. 199, 200*.) She is no longer *sub potestate viri.* See *1 Bishop Mar. Wom., secs. 852–3–4–5–6* to *866; 2 ib., sec. 11* to *27 ; Cole v. Riper, 44 Ill., 58; Cookson v. Toole, 50 ib., 52; Carpenter v. Mitchell, ib., 471; Halley v. Ball, 66 ib., 250; Thompson v. Weller, 85 ib., 200 ; Shafford v. Warren, 47*

Felkner v. Tighe et al.

*Iowa, 47; Deering v. Boyle, 8 Kan., 525; Weeks v. Mitchell, 9 ib., 80; Knaggs v. Mastin, ib., 532; Larimer v. Kelley, 10 ib., 298; Tallman v. Jones, 13 ib., 438; Brookings v. White, 49 Me., 479; Barker v. Hathaway, 5 Allen, 103; Chapman v. Foster, 6 ib., 136; Beal v. Warren, 2 Gray, 447; Kingsley v. Gilman, 15 Minn., 59; Merrill v. Nelson, 18 ib., 366; Place v. Johnson, 20 ib., 219; Handy v. Noonan, 51 Miss., 166; Shivers v. Simmons, 54 ib., 520; Porter v. Haley, 55 ib., 66; Morrison v. Thistle, 67 Misso.; Albany Fire Ins. Co. v. Bay, 4 N. Y., 9; Yale v. Dederer, 18 ib., 265; Vandervoort v. Gould, 36 ib., 639; Prevot v. Lawrence, 51 ib., 219; Frecking v. Rolland, 56 ib., 422; Westervelt v. Ackley, 62 ib., 505; Herrington v. Robertson, 71 ib., 280; Andrews v. Schaffer, 12 How. Pr., 441; Blood v. Humphrey, 17 Barb., 660; Morgan v. Callaland, 5 Chi. L. News, 159; 1 Bish. Mar. Wom., 600; Morgan v. Elam, 4 Yerger, 435.*

The instrument is not an *executory contract* within the decisions of this court. *13 Ark., 533; 14 ib., 628; 15 ib., 184; 18 ib., 469; 27 ib., 61; 29 ib., 357.*

The land certainly should be charged with the money paid by appellant, if the instrument is void.

Cites, in additional brief, *34 Ark., 315; 36 ib., 365, 588; McKesson v. Stanton, 50 Wis., 297; Krouskop v. Shoultz, 51 ib., 204; Married Women's Statutes, Southern Law Review, vol. 7, p. 68, April–May, 1881.*

*George Sibley,* for appellee:

1. The unknown heirs never entered their appearance. The administrator of M. J. Tighe having been removed before action brought, there was no personal representative a party.

2. A married woman can not convey without joining her husband. (*Gantt's Digest, sec. 838; 33 Ark., 432, 723; Cord on Married Women, sec., 253, 411: The Reporter, vol., 11, p. 108, citing Buchannan v. Hazard (S. C.), Penn., Octo-*

*ber, 1880; 2 How. R., p. 411, sec. 434, et seq.; 1 Spence Eq. Jur., 595; 32 Ark., 452.)* She can not make an executory contract, etc. *30 Ark., 392; 2 Story Eq. Jur., 1391, 1399; Hill on Ven., 55, sec. 13–13 a; Cord on Married Women, sec. 721–2, et seq.; The Reporter, vol. 11, p. 109, No. 3; 3 Pars. on Cont. (5th ed.), 413, et seq.; 17 John. R., 584, citing 2 Roper on H. & W., 177; 2 Spence Eq. Jur., 491, 504; 29 Ark., 658.*

By *art. 10, sec. 7, Constitution of 1874*, a married woman is in the same condition as a *femme covert*, at common law, having a separate estate with a power, etc., and while in chancery all her contracts or agreements for the benefit of her separate estate would be enforced against her, the courts would not enforce " her contracts against the corpus of her separate estate " (*Note C, 2 Spence Eq. Jur., 504*), and she can only convey by deed.

The words, " so long as she may choose " must be construed with "conveyed by her as a *femme sole.*" Taken together they indicate that she must register, so as to give public notice. It gives her the profits of any property coming to her as at common law, against her husband and creditors, but leaves the corpus of her estate subject to the marital rights, and the rights of the heir, neither of which can be impaired except by concurrence of the husband, and to secure the rights to the profits she must register under the statute.

Cites *Davis v. Smith (S. C.), Mo., Am. Law Reg., March 1882, vol. 21, No. 3, p. 159.*

SMITH, J. The bill in this case alleges that Margaret Tighe, a married woman, was seized and possessed of a tract of forty acres of land, in her sole and separate right; and that on the eighteenth of February, 1878, she agreed and bound herself in writing to sell and convey the same.

to Felkner, for the consideration of $400; whereof $20 was paid in cash, $280 were to be paid on the first of March, 1878, and the remainder in one year from the date of said contract; that Felkner was let into possession under said contract; but before the installment of $280 became due, Mrs. Tighe had died, and payment of that sum had been made to her administrator; that tender of the remaining $100 had also been made to said administrator, and a demand of a conveyance. This bill was exhibited against the administrator, husband and unknown heirs at law of the deceased woman, to compel them to specifically execute her contract for the sale of the premises. In it the plaintiff offered to pay the remainder that was due upon said purchase.

The husband pleaded the coverture of Mrs. Tighe in bar of the relief sought by the bill, but did not offer to restore the consideration that had been received.

To the answer setting up this defense, a demurrer was overruled, and the plaintiff, standing upon his bill, his suit was dismissed.

It is the settled doctrine of this court, that the disabilities which the common law has thrown around married women for their protection, remain, except in so far as they have been removed by statute. *Hyner v. Dickinson,* 32 Ark., 776; *Wentworth v. Clark, 33 ib., 432; Connor v. Abbott, 35 ib., 365; Stilwell v. Adams, 29 ib., 346.*

1. MARRIED WOMAN: Not bound by title bond to convey land.

It was also well settled that previous to the adoption of our present Constitution, the executory contract of a married woman to convey her land, was not binding upon her. *Stidham v. Matthews, 29 Ark., 650; Wood v. Terry, 30 ib., 385; Rogers v. Brooks, 30 ib., 612.*

The Constitution provides (*art. 10, sec. 7*), that " the real and personal property of any *femme covert* in this State, acquired either before or after marriage, whether by gift,

grant, inheritance, devise or otherwise, shall, so long as she may choose, be and remain her separate estate and property, and may be devised, bequeathed or conveyed by her the same as if she were a *femme sole*."

In *Roberts and Wife v. Wilcoxon & Rose, 36 Ark., 355*, it was held that she might convey her lands under this provision, without her husband joining, and without private examination and acknowledgment of the deed.

In *Bishop's* work on the *Law of Married Women*, vol. *1*, sec. *601*, it is said: "Though the statutes authorize *femmes covert* to convey their lands, and this authority ought to be construed to comprehend everything properly belonging to the contract of actual sale, yet it does not qualify them to enter into a valid executory agreement to sell; for a prior agreement to sell, is not an essential part of the actual selling. * * * In a State like Pennsylvania, where the thing agreed to be done, is looked upon by the tribunals as done, it might take effect as a conveyance. But in the other States generally, and in England, no executory agreement to convey, formal or informal, with or without the concurrence and joinder of the husband, will bind the wife. Not even a court of equity will give such an agreement effect, by decreeing its fulfillment against her."

The cases which hold that a married woman's contract to convey her separate statutory estate are valid, and enforceable in equity against her, have, so far as they have come under our observation, been decided under statutes which confer upon her the power to contract generally, in reference to such estate. *Barker v. Hathaway, 5 Allen, 103; Love v. Watkins, 40 Cal., 547; Kingsley v. Gilman, 15 Minn., 59.*

Our constitutional provision is silent as to this power. Its existence, therefore, can be derived only from inference. In this connection, it is argued that a sale by bond for title

Felkner v. Tighe et al.

is not an executory contract; that in this State and other Southwestern States, it is in such general use, where land is sold upon credit, as to have become one of the recognized forms of conveyance; and that a court of equity looks upon the purchaser as it does upon a mortgagor—that is to say, as the real and beneficial owner of the fee, while the vendor is only entitled to the purchase-price.

It is, perhaps, a sufficient answer to such arguments to refer to the plaintiff's attitude in this suit. If the contract has been already executed, why does he sue for specific execution?

But in truth, his bond for title does not purport to convey any estate. It has not the operative words of a present grant. After reciting the sale and the terms of such sale, it contains an agreement to convey the legal title upon receipt of the remainder of the purchase-money.

Mrs. Tighe might have made an absolute deed to her vendee, and, for security, could have reserved a purchase-lien on the face of the deed, or have taken a mortgage back. But she could not enter into an agreement to convey at a future day, which would bind either her or her heirs.

However, the disability of coverture is a privilege and a shield, and must not be converted into an engine of fraud. The Circuit Court should not have dismissed the bill, but, under the prayer for general relief, should, if the proper parties were before it, have charged the payments already made upon the land. It is a familiar principle in equity that purchase-money, prematurely paid, constitutes a lien upon the land upon which it was paid. *Mackrett v. Simmons, 15 Ves., 344; Adams' Eq., 128,* and cases cited; *Burgess v. Wheate, 1 W. Black, 150; Same Case, 1 Eden, 211; Pilcher v. Smith, 2 Head., 208; Pierson v. Lunn, 10 C. E. Green, 390.*

<em>Payments reclaimed.</em>

Felkner v. Tighe et al.

2. Practice against unknown heirs.    As this cause must be sent back, we call the attention of counsel to the fact that proceedings against unknown heirs are strictly construed. *Gray v. Trapnall, 23 Ark., 510.*

The record does not show any constructive service by publication of notice, nor the necessary affidavit to procure an order of publication. The bill is not even sworn to. The plaintiff will not be entitled to compensation for improvements upon the premises, further than as a set-off against rents and profits during his occupancy.

3. Compensation for improvements.

Reversed, and remanded for further proceedings.

### DISSENTING OPINION.

EAKIN, J. The law regulating the rights and powers of married women, has, for the last century, been in a transition state. The old and barbarous common law doctrine of the absolute civil nonentity of the *femme covert* was, perhaps, well enough adapted to rude conditions of society, amongst an uneducated people, ignorant of social refinements, or amongst Orientals, where the woman is a toy or a nuisance, or amongst savages, where the wife is chiefly valuable as a breeder of the race, and a convenient household drudge. But with the progress of refinement, induced by the increase of wealth, and the diffusion of intelligence, it was felt to be a blot upon the system of English jurisprudence, peculiar to that country, amongst civilized nations.

Whilst it has been retained by the conservatism of the common law courts, it has been gradually but surely dissolving, under the more liberalizing tendencies of the courts of equity, which have been disposed to regard wives as human beings, with personal rights, and free thoughts, endowed with discretion, and as, socially, the equal of their barons. The same spirit was, at a later day, caught up by Parliament and the American Legislatures. The progress

in America has assumed, since 1848, the proportions of a revolution. Our own State has placed herself abreast of the foremost in this movement, by various acts in the last decade, culminating in the sweeping, and, as I think was meant, the all-embracing provision of the Constitution of 1874.

Amidst the great diversity of these enabling acts in the several States, which, all advancing, have not proceeded *pari passu*, the decisions of the courts have been so various and conflicting that the text-writers upon that branch of the law are often themselves misled, and mislead others in their efforts to formulate and announce general principles. None of them are safely reliable, outside of the State in which the decisions which they quote were rendered. In each State the law regarding married women has its own peculiar phase, made up of its own legislation and the *disjecta membra* of the old cast-iron common law structure— the latter often seriously disturbing the spirit and purpose of the former.

In determining the condition of the law in our own State, I think it safest to start from the principles established by the English courts of equity regarding the separate estate, and observe the changes made by our own Legislature, giving full effect to the spirit and purposes of the latter, and construing it liberally, but rationally and legitimately, with a view to its spirit and design.

The separate estate of married women in England was the creation of the courts of equity. It owed its existence to no legislative act. It was in antagonism to the hard and often cruel rules of the common law. Let it be understood, once for all, that courts of law, except under peculiar circumstances, never have, in the absence of a legislative mandate, either in England or America, outside of Louisiana, recognized any power in a married woman to

make any valid contract, in her own right, binding herself or her property. In this respect she stands, at common law, on the same ground with the idiot. Expressions based on this incapacity, pervade many modern decisions, and sometimes, inadvertently used, make confusion in the discussion of her equitable powers.

But in a court of equity she emerged from this abject condition into the light of an advancing civilization, and an atmosphere of human sympathies. The doctrine of her separate estate was this : that, as to that, she was to be regarded as a *femme sole*. She stood as a single woman and a rational being, and "had the same power of disposition over the estate, and was subject to the same liabilities in regard to it as if she were unmarried." (*Bispham's Eq.*, *sec. 101.*) Lord Thurlow, in *Fettiplace v. Georges, 1 Vesey, Jr., 48,* says this was settled in an old case reported by Tothill, with regard to personal property, and it was afterwards held, that this right might be exercised by a disposition *inter vivos* or by will. We have the authority of Mr. Bispham, a very careful writer (citing *34 L. J. Ch., 206,* and *11 Jur. (N. S.), 166,* which are not at hand), for saying that this doctrine is not confined in England to personal estate, but that she may dispose of the *corpus* of her separate real estate, and that, too, by will, or by deed not acknowledged according to the formalities of the statute.

Mr. Story, in his work on Equity Jurisprudence, makes this distinction : That if there be anything in the deed creating the separate estate, indicating an intention to restrain the power of alienation, or that the benefit should continue to her heirs, the *jus disponendi* is to be limited accordingly. This qualification is mostly found in nuptial settlements. But, with regard to her separate estate generally, conveyed to her by a stranger, the right of disposal becomes absolute whenever she appears to be the sole object

of the conveyance.   In illustration he says: "If the property is expressly given to a married woman to her sole and separate use, without saying for life, and she is further authorized to dispose of the same *by will,* in such a case the gift will be construed to confer on her the absolute property, and consequently she may dispose of it *otherwise* than by will; for the absolute property being given, the power becomes nugatory, and is construed to be nothing more than an anxious expression of the donor, that she may have an uncontrolled power of disposing of the property."

It may be well to remark, somewhat in anticipation of the history of the doctrine, that the distinction in the cases, depending upon the grant or limitation of powers of alienation, ceases under our Constitution to be applicable.   By that, all cases now stand, unless specially restrained, upon the ground of those separate estates in England, held with absolute powers of disposition.

The English doctrine with regard to the absolute *jus disponendi,* which a married woman had over her separate estate, independently of statutes, is clearly and broadly announced by the Court of Errors, of New York, in the well known case of *Jacques v. the Methodist Episcopal Church, 17 John., 548*—a case most notable in this, that it overruled a decision of Chancellor KENT, reported in *3 Johnson's Ch., 78.*   Such a decision must have been very carefully con sidered, before announcement in opposition to the views of the eminent jurist, who may be said to have transplanted the English equity system, a full-grown  tree, on this side the ocean.   It was said by SPENCER, Ch. J., in that case, that the decisions fully established "that a *femme covert,* with respect to her separate estate, is to be regarded in a court of equity as a *femme sole,* and may dispose of her property without the consent or concurrence of her trustee, unless she is

specially restrained by the instrument under which she acquires her separate estate." PLATT, J. announced the rule that a *femme covert* having a separate estate, is to be regarded as a *femme sole*, as to her right of *contracting for and disposing of it*. The *jus disponendi* is incident to her separate property, and follows, of course, by implication."

I think, without more citations on this point, I may pass to the English doctrine with regard to her power of contracting concerning it, a power already intimated in the expression of Mr. Justice PLATT, above cited. How it ever came to be asserted that a married woman, having separate property, can make no binding contract concerning or affecting it, is only explicable by the natural disposition of the human mind to generalizations, and the fact that it is true at law generally, and in equity also, in all matters not affecting her separate property. But in equity, as affecting separate property, it is not only illogical but in the teeth of equity practice for more than a century. The general doctrine as it existed in England, has been recognized by this court in cases arising before the Constitution of 1874, but only adopted to a limited extent. It is very broad indeed. It is simply this, that a married woman, having separate property, may bind herself to any money obligation, and that, without anything more, will impose a burden on her separate property—will, in fact, to that extent, so affect her ownership of it that a court of chancery will take hold of it, and, letting her go personally, may, as it were, sequestrate it, in fulfillment of her contract. She can not shield her property under her disability of coverture, against those who have dealt with her in good faith concerning it. Our own court has adopted the rule not as to her contracts generally, but as to those made on her part with reference to her separate estate, and with the intention of binding it, or for its benefit, or for the special ben-

Felkner v. Tighe et al.

efit of the *femme* herself. The difference is only one of evidence, not of principle. The English courts *presume* the contract to have been made concerning, or with reference to, the separate estate. Our court has required that to be affirmatively shown. In either aspect, the equity doctrine is that a married woman may make contracts concerning the separate estate. Where is the line to be drawn as to the nature of the contracts? All contracts which burden lands are in their nature executory. Shall it be said that a woman may freely convey her land, or may mortgage it, or may buy goods, and contract debts that will eat out her beneficial enjoyment of it, and take it away, and still may not, in the most solemn manner, and for an honest consideration partly received, *agree* to convey it? On what principle is her common-law disability to be invoked, to enable her to defeat, specially, this sort of an agreement, when, in all other respects, she is viewed in equity as a *femme sole?* In the last case cited, Chief Justice Spencer says: "That the established rule in equity is, that when a *femme covert*, having separate property, *enters into an agreement*, and sufficiently indicates her intention *to affect by it her separate estate*, a court of equity will apply it to the satisfaction of such an engagement."

But the power of the *femme covert* to make executory agreements with regard to separate estate, did not, in England, rest upon implication or logic. It has been settled by a line of well established decisions. The importance of the principles will excuse a particular notice of some of them.

Mr. *Sugden*, in his work *on Vendors, vol. 1, p. 230*, says that "an agreement by a *femme covert* for sale of her estate can not be enforced either at law or in equity, *unless* the estate be settled to her separate use so as to enable her to dispose of it as if she were *sole.*" In the latter case, even,

24

the author remarks: "Sir Thomas Plummer doubted whether she could bind herself by a contract to sell the property, but adds that the opinion was extra-judicial, and that Sir Thomas himself said he did not mean to give a definitive opinion." He then cites a case from *2 Beav.*, *245*, *Stead v. Nelson*, where " a legal estate was vested in a married woman for life, for the separate use, or to the use of such persons as she, by writing under her hand and seal, should appoint, and in default of her appointment for her separate use. She and her husband gave a promissory note and signed and delivered to the creditor a memorandum, not under seal, whereby they agreed to appoint and convey in mortgage the property settled to the creditor in fee to secure the note." The master of the rolls held her bound by her contract.

*Grigby v. Cox*, *1 Vesey*, *Sr.*, *517*, a case decided by Lord HARDWICKE, was one where a married woman having separate estate sold a part, as the report says, by deeds of appointment. Her husband joined with her in covenanting that there was no incumbrance. I can not gather the exact nature of the instrument, but it seems to have been of an executory character. At least it required a bill to be filed by the purchaser to have the effect of his bargain. The Lord Chancellor, with some reluctance, decreed an execution of the agreement, but the hesitation was not on account of any doubt of the woman's capacity, but because he disapproved of such bargains, without the concurrence of the trustee. No fraud, however, appearing, the relief was granted. Lord THURLOW comments on this case in *Hulme v. Tenant and Wife*, *1 Bro.*, *20*, saying that it appears to be a decree for specific performance, the only defect in the report being the failure to state the trust specifically, so as it might be seen whether the assent of the trustee were requisite. He approves the doctrine, however, as

follows: "In *Grigby v. Cox*, where the wife had contracted to sell her separate estate, being authorized by settlement to dispose of it, the court bound her, as a person equally competent as if *sole*, to a specific performance of the contract. I take it, therefore, it is impossible to say but that a *femme covert* is competent to act as a *femme sole*, with respect to her separate property, where settled to her separate use; but the question here (*Hulme v. Tenant*) goes a little beyond that—it is not only how far she may act on her separate property. I have no doubt about that; but how far her general *personal* engagements shall be executed out of her separate property. If she had *by instrument* contracted that this or that portion of her separate estate should be disposed of in this or that way, I think she or her trustees might have been decreed to make that disposition."

The case of *Dowell v. Dew, 1 Younge & Colyer, 355*, decided by Vice-Chancellor Sir J. L. KNIGHT BRUCE, is directly in point to show that a married woman may, in England, make a purely executory contract regarding her separate estate, and that its performance will be specifically decreed by a court of equity. That was a case where a woman, having a separate estate, with a power of leasing for a term not exceeding twenty-one years, had made a lease for fourteen years. About a year and a half before its execution, she made a written understanding with the tenant that, upon the expiration of his lease, she would make him a new one for the same time on the same terms. The tenant continued in possession after the expiration of his term, and the woman died. No new lease was ever executed. The agreement was, nevertheless, enforced, upon the grounds that the power of leasing would sustain an agreement for a future lease, and that the remaining in possession by the tenant was such part performance as would entitle him to specific performance on the other side, and

it was so decreed. On appeal, Lord LYNDHURST affirmed the decision, saying "he thought there was no sufficient reason why her agreement to execute the power should not have the same effect as if she were unmarried; not, indeed, as to any remedy against her personally, but as to the estate in respect of which the power was to be exercised."

There is a short case of *Baker v. Child*, reported in *2 Vernon, 61*, where it is said by the court: "Where a *femme covert*, by agreement with her husband, is to surreuder, or levy a fine, though the husband die before it is done, the court will, by decree, compel the woman to perform the agreement." The report is so meager that it would have little weight as an independent authority standing alone, to sustain the power of a married woman to make an executory contract which would be specifically enforced. It was remarked by counsel, too, in the case of *Thayer v. Gould, 1 Atkyns, 617*, that the order in *Baker v. Child* was only a recommendation by the court to the parties to settle the matter by a private award, to make an end of the matter in that way; a kind of fraternal advice to which the old Chancellors seem to have been much addicted in doubtful cases. Yet, nevertheless, with that explanation, it is a course which the then Lords Commissioners would scarcely have recommended if they had entertained the idea that a *femme sole* could not make an executory agreement. Such a thing would have been too shocking for contemplation by a common-law judge in 1688, however well disposed he might have been to promote the peace and harmony of suitors.

Laying this case aside, however, there is enough to show, I think, pretty conclusively, that, at the time when the principles and practice of the English courts of equity were adopted for this State, it was well settled: First, that a married woman having property for her separate use, with-

out restriction as to powers of alienation in the instrument creating it, might exercise over it an absolute and unqualified right of disposition; might bind it by her contracts, burden it, dispose of it, or agree to do either; and, second, that a court of equity would enforce such agreements, if of such a nature that specific performance would be proper between parties *sui juris.* In all cases it is to be remembered that specific performance is largely in the discretion of a Chancellor, and will not be decreed unless strictly equitable.

The first step in this State was backward. By the Revised Statutes it was provided that a married woman should convey her real estate by joining with her husband in the execution of the deed, and by undergoing a privy examination before an authorized officer, as to her freedom of will and action. This statute, with regard to her general property not held as separate estate, made a substitute for the English plan of alienation by fine and recovery, and was so far enabling; but, with regard to her separate estate, it threw her back under the control—or at least the restraining power—of her husband; and, by destroying her power of free disposition, undid much of the work of the courts of equity towards her emancipation. With these trammels, it is not at all surprising that some of the old ideas of her common-law incapacity began to supervene, and attach to her separate estate also, so that, with regard to that, she was no longer a *femme sole.* There is good reason to believe that the distinction between her separate property and her general estate, would have come to be lost sight of entirely, or maintained only as a protection against the debts of her husband, or as a bar to his marital rights, but for the decisive and radical change effected by the Constitution of 1874.

It is true that some ameliorations had been effected as to

her powers over her separate personal estate, and the range of her separate estate of all kinds had been increased to embrace all the property she brought in marriage or acquired afterwards, but the idea of her absolute control over it, and the powers she might exercise, were lost or confused in the necessity of filing schedules of personal property, and of joining with her husband in the conveyance of realty. It was difficult to associate these ideas with her powers of absolute disposition, or of making contracts.

By the seventh clause of the tenth article of the Constitution it was in effect provided that all the property of a married woman, how or whensoever acquired, should be her separate property " as long as she may choose," what ever that means; " and may be devised, bequeathed, or conveyed by her, the same *as if she were a femme sole;* and the same shall not be subject to the debts of her husband." This is the very language of the old English courts of equity. They are the terms they used to express her absolute *jus disponendi*, and as including every power of ownership.

This court has already recognized the propriety of giving a liberal construction to this clause, by declaring that it is no longer necessary for the husband to join in the conveyance, or that the woman should be privily examined. The effect of the clause can be nothing less, but may be more, than to restore to the *femme covert*, all the powers and capacities with regard to her separate property which had been accorded her under the English system in equity. The power to contract is not expressly given, but that was not needed. It had continued to be recognized by this court as a remnant of the English system, with only this modification that the contract must be shown to have been with reference to the separate estate; or for its benefit, or the special benefit of the *femme covert.*

It would be anomalous now to hold that the *femme covert*, with regard to her separate property, should remain under the old common law disability with respect to executory contracts to do what she is expressly enabled to do. I can not think that within the spirit of the meaning or purposes of the Constitution.

Up to this point I have treated a title bond for a legal conveyance, on payment of a certain sum of purchase-money, as an executory contract. It is so in form, but really it is in equity a conveyance operating *eo instanti*, and *proprio vigore*, to vest title. It is a mode of conveyance in common use, which, without carrying the legal title, conveys the right to the property, and the present beneficial enjoyment. It is something like the original bargain and sale, which was at first only a contract to stand seized to uses, but which did not carry the legal title until the statutes of uses came to its aid. Yet in .equity it did vest the beneficial enjoyment and right of property. It came in time to be a common assurance of title. In like manner title bonds of this class are used simply to retain a lien for purchase-money. They divest the former owner of all his rights as effectually as if he had made a deed and taken a mortgage back. He can never reclaim the land, nor buy it in, except on equal terms of competition with all the world. The interest of the purchaser may be taken in execution. It has gone from the vendor and his right is no longer to land, but to money. The language of the Constitution is not to be confined to dry transfers of legal titles. I think that would be too literal. A *femme sole* may sell on a credit and convey by title bond, and thus divest herself of ownership and retain a lien. If a *femme covert* can not, but must execute a deed and retake a mortgage to effect precisely the same thing, how can she be said to convey as a *femme sole?* Can she not do "the

same?" What is the substantial difference in the modes, or why should the *femme covert* be driven from one, and forced to adopt the other? Is there anything wholesome in such conservatism as that?

Saving the New York case, decided on English law, I have purposely avoided allusion to American decisions, and especially American text-books, for the simple reasons that they afford no light. The decisions are unsafe guides, partly because they deal with local statutes, and partly because in the modern rage to catch up with the dockets, they are, many of them, hastily and illy considered. The text-books in their generalization of matters depending on local statutes are unsafe guides. Each State must perfect its own system, upon its own legislation, under guidance of its own judicial history. I have, in arriving at my conclusion, endeavored to follow this plan; but it is consoling to think that if I err, it is in company with the courts of Pennsylvania, Massachusetts, and several other States, which, under statutes of like import with our Constitution, have held that a *femme covert* may make a title bond of her separate property, which will be enforced.

Here there was a *bona fide* sale of separate property, part payment, possession in accordance with the agreement, death of the vendor, payment of a large portion of the purchase-money, all under a title bond. Then there was tender of the balance, and demand for a formal deed. The case is precisely that of *Dowell v. Drew, in Younge and Collier (supra)*, and the relief should have been granted even in the view that a title bond is a mere executory contract. I think the Chancellor erred in overruling the demurrer to the husband's answer, and in dismissing the bill.